# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SCOTT LAUTENBAUGH, on behalf of himself and the class he seeks to represent, | ) ) ) | |
| | ) | Case No. 4:12-cv-03214-RGK |
| Plaintiff, | ) ) | **DEFENDANTS' MEMORANDUM OF** |
| | ) | **LAW IN OPPOSITION TO** |
| v. | ) | **PLAINTIFF'S MOTION FOR** |
| | ) | **SUMMARY JUDGMENT AND** |
| NEBRASKA STATE BAR | ) | **IN SUPPORT OF DEFENDANTS'** |
| ASSOCIATION, *et. al.*, | ) | **CROSS-MOTION FOR SUMMARY** |
| | ) | **JUDGMENT** |
| Defendants. | ) | |

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS ...................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ........................................................................................................... 1

BACKGROUND .............................................................................................................. 3

   I.   The Nebraska Bar Association Prior to 2014 ............................................... 3

       A.   The NSBA's Purpose as Defined By Supreme Court Rule ................... 3

       B.   The NSBA's Legislative Program ......................................................... 4

       C.   The NSBA's "Check-Off" Procedure .................................................... 8

       D.   The NSBA's Member Dues Grievance Procedure ................................ 9

   II.   Plaintiff's Petition In The Nebraska Supreme Court ................................ 10

   III.   Plaintiff's Claims And Requests For Relief ............................................. 12

LEGAL ARGUMENT AND AUTHORITY .................................................................. 14

   I.   Standard For A Motion For Summary Judgment ..................................... 14

   II.   This Lawsuit is Moot Because the Nebraska Supreme Court Has Changed the Supreme Court Rules Governing the NSBA's Use of Mandatory Bar Dues. .................... 15

       A.   An Existing Case or Controversy is Required Throughout a Judicial Proceeding or the Plaintiff's Claim is Rendered Moot. ........................ 15

       B.   The Nebraska Supreme Court's Order of December 6, 2013 Rendered Plaintiff's Claims Moot. ..................................................................... 16

       C.   Plaintiff's Claims Do Not Fall Within the Limited Exception to the Mootness Doctrine ....................................................................................... 18

   III.   The 2013 NSBA Practices and Procedures For Funding its Legislative Program Were Constitutionally Valid. ............................................................... 21

       A.   The NSBA May Use Mandatory Member Dues For Germane Legislative Activities, Including Lobbying on Subjects Germane to the Purposes of the NSBA and Disseminating Information on Pending Legislation. ......................... 21

       B.   The NSBA May Use Mandatory Member Dues For Limited Social Activities, Conferences and Publications Because Such Activities are Germane to the Purposes of the NSBA. ............................................................ 28

       C.   Under its 2012 Legislative Procedure & Policy Statement, Legislative Check-Off and Grievance Procedures, the NSBA Established Adequate Procedures to Protect the Constitutional Rights of its Members. ........................... 29

          1.   The NSBA Legislative Check-Off Procedure complied with *Hudson*. ..... 31

          2.   The NSBA opt-out system was constitutionally valid. ................... 34

          3.   The NSBA provided adequate notice to its members concerning its lobbying activities prior to collecting mandatory dues, providing members with an opportunity to opt-out of compelled speech activities. .35

D.      Plaintiff Was Not Denied Any Due Process Right as Provided by *Keller* and
        *Hudson*. ........................................................................................................36

CONCLUSION ..................................................................................................................37

DB04/0012516.0799/10502824.2

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abood v. Detroit Bd. of Educ.*,
    431 U.S. 209 (1977) ...........................................................................21, 26, 30

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...........................................................................14

*Arizonans for Official English v. Arizona*,
    520 U.S. 43 (1997) .............................................................................15

*Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*,
    529 U.S. 217 (2000) ...........................................................................27

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ...........................................................................14

*Chicago Teacher's Union v. Hudson*,
    475 U.S. 292 (1985) ...........................................13, 20, 30, 31, 33, 34, 35, 36

*Clark v. Brewer*,
    776 F.2d 226 (8th Cir. 1985) .............................................................19

*Crosetto v. State Bar*,
    12 F.3d 1396 (7th Cir. 1993) .............................................................30

*Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Employees*,
    466 U.S. 435 (1984) ...........................................................................28, 29

*FEC v. Wis. Right to Life, Inc.*,
    551 U.S. 449 (2007) ...........................................................................19

*Gardner v. State Bar of Nevada*,
    284 F.3d 1040 (9th Cir. 2002) ...........................................................25

*Genesis Healthcare Corp. v. Symczyk*,
    133 S. Ct. 1523, 185 L. Ed. 2d 636 (2013) ......................................15, 16, 18

*Gibson v. The Florida Bar*,
    798 F.2d 1564 (11th Cir. 1986) .........................................................23

*Gray v. City of Valley Park*,
    567 F.3d 976 (8th Cir. 2009) .............................................................16

iii

*Hechenberger v. W. Elec. Co., Inc.,*
  742 F.2d 453 (8th Cir. 1984) ...................................................14

*Hickman v. Missouri,*
  144 F.3d 1141 (8th Cir. 1998) .................................................19

*M.P. ex rel. K. v. Indep. Sch. Dist. No. 721,*
  326 F.3d 975 (8th Cir. 2003) ...................................................14

*Keller v. State Bar of California,*
  496 U.S. 1 (1990)..................................2, 3, 6, 17, 21, 22, 23, 24, 26, 27, 28, 29, 30, 31, 36, 37

*Kingstad v. State Bar of Wisconsin,*
  622 F.3d 708 (7th Cir. 2010) .........................................22, 25, 31

*Knox v. SEIU, Local 1000,*
  132 S. Ct. 2277 (2012) ...........................................................34

*Lathrop v. Donohue,*
  367 U.S. 820 (1961)................................................................21

*Levine v. Heffernan,*
  864 F.2d 457 (7th Cir. 1988) .............................................31, 32

*Lewis v. Continental Bank Corp.,*
  494 U.S. 472 (1990)............................................................2, 16

*Morrow v. State Bar of California,*
  188 F.3d 1174 (9th Cir. 1999) ................................................21

*B.J.S. ex rel. N.S. v. State Educ. Dep't/Univ. of State of N.Y.,*
  815 F. Supp. 2d 601 (W.D.N.Y. 2011)...................................20

*Nitsche v. CEO of Osage Valley Elec. Coop.,*
  446 F.3d 841 (8th Cir. 2006) ...................................................14

*Peter v. Wedl,*
  155 F.3d 992 (8th Cir. 1998) ...................................................14

*Popejoy v. New Mexico Bd. of Bar Comm'rs,*
  887 F. Supp. 1422 (D.N.M. 1995) ..........................................23

*Preiser v. Newkirk,*
  422 U.S. 395 (1975)................................................................19

*Ringo v. Lombardi,*
  677 F.3d 793 (8th Cir. 2012) ...................................................16

iv

*Rounds v. Oregon State Bd. of Higher Educ.*,
    166 F.3d 1032 (9th Cir. 1999) .................................................31

*Schneider v. Colegio de Abogados de Puerto Rico*,
    917 F.2d 620 (1st Cir. 1990) ....................................................23

*Shipman v. Missouri Dep't of Family Servs.*,
    877 F.2d 678 (8th Cir. 1989) ....................................................14

*Streck, Inc. v. Research & Diagnostic Sys., Inc.*,
    658 F. Supp. 2d 988 (D. Neb. 2009) ........................................16

*Thiel v. State Bar of Wisconsin*,
    94 F.3d 399 (7th Cir. 1996) ................................................24, 25

*United States v. United Foods, Inc.*,
    533 U.S. 405 (2001) .................................................................27

**Rules**

Fed. R. Civ. P. 56(c) ....................................................................14

Neb. S. Ct. R. § 3-803 ...........................................................16, 18

Neb. S. Ct. R. §3-803(D) ............................................................18

Neb. S. Ct. R. §3-802 .............................................................23, 24

Neb. S. Ct. R. §3-803(D)(2)(b) ...................................................33

Neb. S. Ct. R. §3-802(A) ...........................................4, 5, 6, 7, 8, 9, 10

**Statutes**

42 U.S.C. § 1983...........................................................................12

v

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SCOTT LAUTENBAUGH, on behalf of himself and the class he seeks to represent, | ) ) ) | |
| | ) | Case No. 4:12-cv-03214-RGK |
| Plaintiff, | ) ) | **DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO** |
| v. | ) ) | **PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND** |
| NEBRASKA STATE BAR ASSOCIATION, *et. al.*, | ) ) ) | **IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | ) | |

## INTRODUCTION

Plaintiff's motion should be denied and Defendants' cross-motion granted because this lawsuit is moot.  Prior to filing his Complaint, Plaintiff initiated parallel rulemaking proceedings before the Supreme Court of Nebraska.  On December 6, 2013, the Nebraska Supreme Court issued an Order, which resolved all issues raised in Plaintiff's Complaint.  The Order modified the stated purposes, powers and duties of the NSBA by Supreme Court Rule and revised the manner in which the Nebraska State Bar Association ("NSBA"), collects, spends and accounts for member dues.  (*See* Doc. #54-1).  There is no further controversy for resolution by this Court, as the NSBA no longer exists in the form challenged in Plaintiff's Complaint.  Accordingly, a *post-hoc* analysis of the NSBA's procedures in 2013 is unwarranted.  Plaintiff's Complaint requested prospective relief only and such relief was granted by the Nebraska Supreme Court, thus resolving any doubt that current NSBA practices and policies meet constitutional standards.

Plaintiff now asks this Court to engage in a fact-intensive inquiry to evaluate the prior 2013 NSBA funding system so he can recover the $275.00 deposited in Plaintiff's trust account during this case.  (Doc. #62, "Plaintiff's Memo," p. 8-10).  The NSBA does not intend to seek Plaintiff's $275.00 in 2013 membership dues. (DSOMF, ¶44).  Moreover, the NSBA Legislative

1

Program is no longer funded with mandatory membership dues and, going forward, will only be funded only with voluntary payments from its members.  (DSOMF, ¶42).  Plaintiff's Motion for Summary Judgment therefore requests an analysis of prior policies and practices that are no longer enforced by the NSBA.  (DSOMF ¶42-43).

Plaintiff likely hopes to parlay the *de minimis* sum held in his trust account into an award of attorneys' fees.  The Court should reject Plaintiff's argument, because his Complaint was unnecessary to resolve any perceived constitutional deficiencies in NSBA practices.  The Nebraska Supreme Court—at Plaintiff's request—undertook an extensive analysis of NSBA procedures and, on its own accord, revised those procedures.  Plaintiff began this lawsuit with full knowledge that the Nebraska Supreme Court would likely address, amend or otherwise revise the NSBA procedures before final resolution by this Court, and he cannot now seek to extend this action beyond its logical temporal bounds in search of fees.  *See Lewis v. Continental Bank Corp.,* 494 U.S. 472, 480 (1990) (finding that a plaintiff's interest in prevailing party attorney's fees is insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim).

Moreover, even assuming *arguendo* that this Court were inclined to issue an advisory opinion concerning the NSBA's prior system of receiving, accounting and spending membership dues—despite the fact that this system has undergone wholesale revisions—Defendants are nonetheless entitled to summary judgment because the NSBA's 2013 funding system was constitutionally adequate under *Keller v. State Bar of California,* 496 U.S. 1 (1990), and its progeny.  As discussed herein, the Nebraska Supreme Court has taken an extremely conservative approach in amending its Rules to resolve any doubts about *Keller* compliance.  However, even prior to these revisions, the NSBA appropriately defined those activities "chargeable" to

2

mandatory member dues, notified members concerning NSBA spending, and provided "opt-out" and grievance procedures for any member dissatisfied with NSBA spending, consistent with the requirements of *Keller*.

For the reasons discussed herein, this Court should deny Plaintiff's Motion for Summary Judgment and grant Defendants' Cross-Motion for Summary Judgment.

**BACKGROUND**

## I.     The Nebraska Bar Association Prior to 2014

### A.     The NSBA's Purpose as Defined By Supreme Court Rule

Since 1937, the NSBA has operated as a unified bar, which means that any individual wishing to practice law in the State of Nebraska must be a member and pay mandatory dues. (DSOMF, ¶1). The NSBA is regulated directly by the Nebraska Supreme Court and its activities are governed by Rules promulgated by the Nebraska Supreme Court. (*Id.,* ¶2). The NSBA is empowered by the Nebraska Supreme Court to improve the administration of justice by maintaining high standards of conduct, integrity, confidence and public service for Nebraska attorneys. (*Id.,* ¶3).

Specifically, the Supreme Court Rules as of 2013 provided that the purposes of the NSBA were:

(a)     to improve the administration of justice;

(b)     to foster and maintain high standards of conduct, integrity, confidence, and public service on the part of those engaged in the practice of law;

(c)     to safeguard and promote the proper professional interests of the members of the Bar;

(d)     to provide improvements in the education and qualifications required for admission to the Bar, the study of the science of jurisprudence and law reform, and the continuing legal education of the members of the Bar;

(e)     to improve the relations of the Bar with the public;

(f)     to carry on a continuing program of legal research; and

(g)     to encourage cordial relations among the members of the Bar.

(DSOMF, ¶4).

3

As of 2013, the NSBA was tasked with collection of mandatory member dues as set by the Nebraska Supreme Court in the amount of $275.00 for active members (with more than 4 years of practice) and an additional $60.00 disciplinary assessment.  (*Id.*, ¶5).  Under the more general principles outlined in Rule §3-802(A), however, the NSBA is also charged with safeguarding the professional interests of its members and keeping them apprised of changes in jurisprudence and reforms in the law.

### B.      The NSBA's Legislative Program

To further the purposes of the NSBA as enumerated by the Nebraska Supreme Court in §3-802(A), as it existed in 2012, the NSBA House of Delegates implemented its revised Legislative Program & Policy Statement in October 2012.  (DSOMF, ¶6).  Specifically, this policy statement was designed to further the NSBA's mandate "to improve the administration of justice," "to safeguard and promote the proper professional interests of the members of the Bar" and "provide improvements… in the study of the science of jurisprudence and law reform, and the continuing legal education of the members of the Bar."  (*Id*).

The NSBA Legislative Program supports the "initiation, support, opposition, or comment on legislative matters before the Nebraska Legislature, the Congress of the United States, or the Federal or State Executive Departments."  (DSOMF, ¶7).   As of 2013, the NSBA used this comprehensive procedure for reviewing, analyzing, drafting, and considering proposed legislation, including an extensive review process to determine whether to take a position on a legislative bill.  (*Id*).

The NSBA Legislative Program was also implemented to directly inform all NSBA members concerning pending legislation that may be of interest to its members.  (DSOMF, ¶8).  The Legislative Program & Policy Statement specifically notes that monitoring legislation proposed in the Nebraska legislature is an important component of the Program.  (*Id*.)  Pursuant

4

to its contract with the NSBA, Legislative Counsel Mueller Robak was responsible for tracking bills in the legislature, informing NSBA sections and the membership of particular bills of interest and, if a formal position is taken by the NSBA, lobbying the legislature on behalf of the NSBA.  (*Id.*, ¶9).

In this role, Mueller Robak engaged in both administrative tasks designed to convey information to the NSBA membership and limited lobbying activity once the NSBA had taken a formal position on a bill.  Mueller Robak used its extensive experience in legislative advocacy to determine the total proportion of its activities that were merely administrative, and those that included advocacy on behalf of the NSBA.  (DSOMF, ¶10).  Mueller Robak calculated that approximately two-thirds of its time working on behalf of the NSBA was spent on administrative tasks and about one-third on legislative advocacy.  (*Id.*)

Under the 2012 Legislative Program, information concerning pending legislation, including the status of a bill and the NSBA's position, if any, was distributed by e-mail to all NSBA members by Legislative Counsel on a weekly basis during the legislative session through the NSBA's Legislative Update.  (DSOMF, ¶11).  Information concerning the legislative session, including each bill introduced, was summarized by Legislative Counsel and distributed to all members in periodic Legislative Summaries.  (*Id.*)

NSBA staff members were likewise responsible for administrative tasks designed to review legislation and disseminate information to NSBA membership and appropriate committees.  (DSOMF, ¶12).  Once a particular bill was identified by NSBA staff or Legislative Counsel as being of interest to the NSBA, it was referred to the NSBA Committee on Legislation.  (*Id.*)

DB04/0012516.0799/10502824.2

The Committee on Legislation was comprised of lawyers from throughout Nebraska who practiced in all major areas of substantive law.  This Committee met at least three times per year to review proposed, as well as pending, legislation and make recommendations to the elected members of the Executive Council and House of Delegates as to whether the NSBA should take a formal position on a particular bill.  (DSOMF, ¶13).

Under its 2012 Legislative Program & Policy Statement, the NSBA Legislation Committee reviewed whether a particular bill was germane to the purposes of the NSBA any time a member was interested in taking a position on it.  (DSOMF, ¶14).   As part of this review process, if any NSBA member believed that a bill is not germane, the issue was debated in committee.  (*Id*.)   Pursuant to its 2012 Legislative Program & Policy Statement, the NSBA only took positions on legislation germane to the purposes of the NSBA, as defined by the Nebraska Supreme Court Rules.  (*Id*.)   The NSBA Legislation Committee refused to take positions on certain bills because they were not found to be germane under the *Keller* analysis.  (*Id*.)

Likewise, under its 2012 Legislative Program & Policy Statement, the NSBA Executive Council provided a second level of review as to whether a particular bill was germane to the purposes of the NSBA as set forth by the Nebraska Supreme Court.  (DSOMF, ¶15).   The members of the NSBA House of Delegates, elected by district by the lawyers of the state of Nebraska, established by majority vote the NSBA position on legislative matters that are within the legislative policy of the NSBA.  (DSOMF, ¶16).  Included within this analysis was a third level review as to whether a particular bill was germane to the purposes of the NSBA.  (*Id*.)  The Legislative Program & Policy Statement was provided to all new members of the Legislation Committee, Executive Counsel and House of Delegates as part of orientation for new members. (*Id*.)

Under the NSBA Legislative Program, as it existed in 2013, NSBA officers sometimes offered testimony in the Nebraska legislature when the NSBA had taken a formal position on a bill pursuant to the 2012 Legislative Program & Policy Statement. (DSOMF, ¶46). However, NSBA officers were never compensated with NSBA membership dues. (*Id.*) Similarly, NSBA members serving in the NSBA House of Delegates, Executive Council and Legislation Committee were volunteers and were not compensated with NSBA membership dues. (*Id.*)

When time did not permit the House of Delegates to establish legislative positions, the positions of the NSBA were established by a majority vote of the voting members of the Executive Council of the NSBA or, where time did not permit obtaining the approval of the voting members of the Executive Council, by the President or in his or her absence or inability to act, by the President-Elect of the NSBA. (DSOMF, ¶17). However, it was extremely rare for these alternate procedures to be used. (*Id.*)

Moreover, under the 2012 Legislative Program, any Committee or Section could request that the NSBA sponsor legislation by providing the Legislation Committee the legislation proposed. (DSOMF, ¶18). If sponsorship of the proposed legislation was recommended by the Legislation Committee, the proposal was forwarded to the House of Delegates for review and comment. Comments by House of Delegates members were considered by the Executive Council at its meeting where it decided whether to authorize NSBA Legislative Counsel to request that such legislation be introduced. (*Id.*)

Additionally, Committees and Sections were assigned proposed or pending legislation to review and comment upon, and Committees and Sections that desired the NSBA to take a specific position on pending legislation were authorized and encouraged to inform the Legislation Committee of such a request. (DSOMF, ¶19). Any individual member of the NSBA

7

that desired the NSBA to have legislation introduced is encouraged to inform the Legislation Committee of the nature of the legislation proposed.  (*Id.*)

Prior to establishing a legislative position, the NSBA and its leadership made an effort to encourage as wide a participation of the membership as was possible in formulating positions, and respect divergent opinions of subgroups within the legal profession.  Once a legislative position was established, the members of the NSBA, especially Sections and Committees, were informed of such positions. (DSOMF, ¶20).  Any position taken by the NSBA on legislation did not prevent an individual member from taking and expressing a contrary position. (*Id.*)

In the fall 2013 legislative session, for example, there were approximately 665 bills introduced in the Nebraska legislature.  Legislative Counsel forwarded approximately 127 for NSBA review and the NSBA eventually took a position on 30 of them following review under the Legislative Program & Policy Statement.  (DSOMF, ¶21).

## C.     The NSBA's "Check-Off" Procedure

Under its 2012 Legislative Program, the NSBA also utilized a "Legislative Check-Off" procedure that allowed members to prevent their mandatory dues from funding the lobbying activities of the NSBA.  (DSOMF, ¶22).  Pursuant to the Legislative Check-Off procedure, each year, NSBA members received an annual dues statement, which included the Legislative Check-Off.  That option read: "I do not want any portion of my dues used for lobbying purposes. Check here."  (*Id.*, ¶23).

Prior to receiving the annual dues statement, NSBA members were given access to various sources of information concerning NSBA expenditures of mandatory member dues for the prior year including the NSBA's Statement of Activities, NSBA's Annual Budget, Legislative Summaries and Updates provided by Legislative Counsel, and the NSBA's annual audit made available to all NSBA members upon request.  (DSOMF, ¶45).

8

If checked, the objecting member's dues were not used to fund <u>any</u> of the NSBA's lobbying activities through its legislative counsel Mueller Robak—even those lobbying activities which were not political or ideological in nature and are germane to the purposes of the NSBA. (DSOMF, ¶24).   Instead, dues paid by NSBA members who had "checked off" were reduced from the NSBA general fund by the percentage attributable to those lobbying activities and segregated from general NSBA expenditures, including such lobbying activities.   Those segregated funds were placed into the NSBA legislative check off reserve by an accounting journal adjustment.  (*Id*.)

NSBA Legislative Counsel, Mueller Robak, was retained under contract to perform lobbying and other professional services for the NSBA for approximately $90,000.00 per year. (DSOMF, ¶25).   Pursuant to the contract, the amount paid to Mueller Robak was reduced, on a pro-rata basis, by the amount of the segregated dues under the Legislative Check-Off procedure. (Id.)   In fact, the legislative check off reserve is never used to fund <u>any</u> legislative activities. (DSOMF, ¶26).   The legislative check-off reserve was never used for lobbying purposes and never used to pay legislative counsel, Mueller Robak.  (*Id*.)  Instead, the legislative check off reserve could only be accessed by authorization of the Executive Council for specific NSBA projects that have no relationship to legislative advocacy.  (*Id*.)  The legislative check off reserve fund maintained by the NSBA had not been accessed by the NSBA during the period from 2010- 2012.  (*Id*.)

### D.    The NSBA's Member Dues Grievance Procedure

In addition to the Legislative Check-Off mechanism, the NSBA also operated a Member Dues Grievance Committee specifically devoted to addressing "a claim by a member that the member's current dues are being used to fund an activity that violates a member's free speech or association rights under the First and Fourteenth Amendments to the Constitution…"  (DSOMF,

¶27).   The Grievance Procedure required that an objecting member file a written grievance identifying the activity being challenged and describing the legal and factual basis for the dispute.  (Id. at ¶28).  The Procedure was available to any member so long as that member did not utilize the Legislative Check-Off box on his/her dues statement.  (*Id.*)

Grievances were considered by a Dues Grievance Committee comprised of three NSBA members who are not Association officers or members of the House of Delegates, Executive Council, or Legislation Committee.  (DSOMF, ¶29).   The Committee reviewed the grievance and made a recommendation to the Executive Council prior to the Council's next regularly scheduled meeting.  (*Id.*)

If the Committee determined that the challenged activity violated the member's rights, the Committee "shall recommend to the Executive Council whether the House of Delegates and Executive Council should cease such activity or refund that portion of the grievant's dues expended for said activity."  (DSOMF, ¶30).   The Executive Council was required to make a final determination on the grievance within 30 days after receiving the Committee's report.  (*Id.*)

## II.     Plaintiff's Petition in the Nebraska Supreme Court

On February 29, 2012, Plaintiff filed a Petition for Rule Change with the Nebraska Supreme Court challenging the requirement that association membership in the NSBA be a mandatory precondition to practice in the State.  (DSOMF, ¶31).[1]   In response to Plaintiff's Nebraska Petition, the Nebraska Supreme Court opened a period for comment by interested parties.  (Id., ¶32).  This period closed on June 1, 2012.  (*Id.*)

Shortly thereafter, the Court issued an Order recognizing that the NSBA's long history, "the original reasons for the bar's creation as a mandatory bar, and the complex and important legal questions raised by the petition and comments received herein require comprehensive

---

[1] Plaintiff filed this lawsuit in federal court over seven months later.  (*See* Doc. #1).

analysis and careful consideration, thus necessitating additional time for the Court to study this matter." (DSOMF, ¶33). The Nebraska Supreme Court then issued another Order, explaining that it had reviewed the factual, legal and policy issues raised by the Nebraska Petition and requesting additional information from the parties. (*Id.*, ¶34). On December 3, 2012, in accordance with the Nebraska Supreme Court's Order, the NSBA submitted a 114-page Report of the NSBA on Programs, Activities and Services to the Nebraska Supreme Court. (*Id.*, ¶35). Plaintiff was given an opportunity to respond at each stage of the state-court proceedings.

The Nebraska Supreme Court then issued its final Order of December 6, 2013, substantially revising the Nebraska Supreme Court Rules governing the NSBA as of January 1, 2014. (Doc. #54-1, pp. 23-54). Recognizing that it has "intentionally chosen to draw the line in a manner that forgoes the opportunity to expend mandatory assessments for some purposes that might well be adjudged as germane[,]" the Nebraska Supreme Court did not merely tailor its new rulemaking to comply with First Amendment jurisprudence, but to leave no doubt that the NSBA's limited activities to be conducted with mandatory dues are closely linked to "regulation of the legal profession." (Doc. #54-1, p. 20-21).

As a result of the Nebraska Supreme Court's Order, the NSBA Legislative Program is no longer funded with mandatory membership dues, and continues to be funded only with voluntary payments from its members. (DSOMF, ¶42). Legislative Counsel Mueller Robak is now paid only with voluntary donations from NSBA members in performing both its administrative and advocacy-based tasks. (*Id.*)

Notably, Plaintiff has deposited $275.00 in his trust account upon a stipulation of the parties entered in this case on December 13, 2012, representing Plaintiff's NSBA membership dues for 2013. (DSOMF, ¶43-44). The NSBA does not intend to seek Plaintiff's 2013

membership dues currently held in Plaintiff's trust account and has explained to Plaintiff that it

does not intend to seek his membership dues for 2013.  (*Id*.)

## III.   Plaintiff's Claims and Requests For Relief

Plaintiff's claims before this Court challenge a system of funding the NSBA Legislative

Program that no longer exists.  Specifically, Plaintiff's Class Action Complaint for Declaratory

and Injunctive Relief sought:

1. Entry of judgment declaring that Plaintiff Lautenbaugh and other class members have First Amendment rights against compelled speech and compelled association, and therefore have a constitutional right to prevent Defendants from using their member dues on nonchargeable activities.

2. Entry of judgment declaring that Defendants' Lobbying Check-Off and Grievance Procedures are unconstitutional, and that using mandatory dues for non-chargeable activities while maintaining such policies deprives Plaintiff Lautenbaugh and other class members of rights, privileges, and/or immunities secured to them by the First and Fourteenth Amendments, and, therefore, Defendants are liable to Plaintiff Lautenbaugh and other class members under 42 U.S.C. § 1983.

3. Entry of judgment declaring that Defendants' practice of using an opt-out procedure for funding non-chargeable activities is unconstitutional, and using mandatory dues for non-chargeable activities while maintaining an opt-out procedure rather than an opt-in procedure deprives Plaintiff Lautenbaugh and other class members of rights, privileges, and/or immunities secured to them by the First and Fourteenth Amendments, and, therefore, Defendants are liable to Plaintiff and other class members under 42 U.S.C. § 1983;

4. Entry of judgment declaring that Defendants' Lobbying Check-Off and Grievance Procedures fail to comply with *Hudson* and thus deprive Plaintiff Lautenbaugh and other class members of their Fourteenth Amendment right to procedural due process, and, therefore, Defendants are liable to Plaintiff Lautenbaugh and other class members under 42 U.S.C. § 1983;

5. Entry of preliminary and permanent injunctions against Defendants prohibiting the collection of mandatory member dues from Plaintiff Lautenbaugh and other class members unless and until procedures that properly safeguard the First and Fourteenth Amendment rights of Plaintiff Lautenbaugh and other class members are adopted.

(*See* Doc. #1, p. 21).

By the Nebraska Supreme Court Order of December 6, 2013, however, the scope of activities performed by the NSBA with mandatory dues has been expressly limited to only those limited activities directly related to "regulation of the legal profession."  As such, with regard to Plaintiff's first request for relief, any arguably "non-chargeable" activities of the NSBA are no longer funded with mandatory dues.  With regard to Plaintiff's second request for relief, the NSBA Lobbying Check-Off and Grievance Procedures are no longer used by the NSBA to govern mandatory dues, nor are they needed to protect the First Amendment rights of an objecting member, because no mandatory dues are used for lobbying or other conceivably "non-chargeable" activities.

With regard to Plaintiff's third request for relief, the distinction between an opt-in and opt-out system is completely irrelevant because the NSBA Legislative Program is not funded with mandatory dues.  Likewise, with regard to Plaintiff's fourth request for relief, the *Hudson* notice requirements allowing members to properly utilize an opt-out system are unnecessary because the NSBA Legislative Program is no longer funded with mandatory dues.  Finally, an injunction is completely inappropriate, given that the Nebraska Supreme Court has already amended its rules to address any perceived constitutional deficiency.

In short, Plaintiff's claims are moot.  Plaintiff's request that this Court analyze a system of NSBA funding that no longer exists serves no purpose, other than to permit Plaintiff to unnecessarily extend these proceedings.  Plaintiff's concerns have been directly addressed and resolved by the Nebraska Supreme Court.  Summary Judgment should be granted in favor of Defendants as to Plaintiff's now-moot constitutional claims.

## LEGAL ARGUMENT AND AUTHORITY

### I.    Standard For a Motion For Summary Judgment

Summary judgment is proper where the pleadings, discovery and affidavits show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).   In considering a motion for summary judgment, the court does not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue.  *Peter v. Wedl*, 155 F.3d 992, 996 (8th Cir. 1998).  Rather, viewing the evidence in the light most favorable to the non-moving party, the court views the facts and evidence as a whole.  *Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 845 (8th Cir. 2006).  The party opposing summary judgment must set forth specific facts showing there is a genuine issue of material fact for trial.  *Celotex Corp.*, 477 U.S. at 324.  Mere allegations, unsupported by specific facts or evidence beyond the non-moving party's own conclusions, are insufficient to withstand a motion for summary judgment.  *Id.*

Although mootness is often addressed in the context of a motion to dismiss for lack of subject matter jurisdiction, the Court may grant summary judgment for a defendant upon a finding that plaintiff's claims for injunctive and declaratory relief have been rendered moot by a change in factual circumstances, or a change in law or policy, while the case is pending.  *M.P. ex rel. K. v. Indep. Sch. Dist. No. 721*, 326 F.3d 975, 979 (8th Cir. 2003); *Shipman v. Missouri Dep't of Family Servs.*, 877 F.2d 678, 679 (8th Cir. 1989); *Hechenberger v. W. Elec. Co., Inc.,* 742 F.2d 453, 454 (8th Cir. 1984) (noting also that a claim for fees under a catalyst theory does not save plaintiff from judgment in favor of the defendant where a claim is rendered moot).

14

The material facts in this case are undisputed.  Here, Plaintiff's claims for prospective declaratory and injunctive relief were fully resolved by the Nebraska Supreme Court, and summary judgment should therefore be granted in favor of Defendants.

## II.   This Lawsuit is Moot Because the Nebraska Supreme Court Has Changed the Supreme Court Rules Governing the NSBA's Use of Mandatory Bar Dues.

The December 6, 2013 Order issued by the Nebraska Supreme Court amended its Rules to "ensure that the Bar Association remains well within the limits of the compelled-speech jurisprudence of the U.S. Supreme Court" and has thereby rendered Plaintiff's Complaint moot. (Doc. #54-1, p. 19).  The Court's Order resolved all claims raised by Plaintiff's Complaint and completely revised the prior system of funding NSBA activities challenged by Plaintiff in this action.  By its Motion for Summary Judgment, Plaintiff admittedly does not seek to challenge the system of NSBA funding as it currently exists.  (Plaintiff's Memo, p. 8). Therefore, there is no active case or controversy remaining for judicial resolution.

### A.   An Existing Case or Controversy is Required Throughout a Judicial Proceeding or the Plaintiff's Claim is Rendered Moot.

"Article III, § 2, of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies,' which restricts the authority of federal courts to resolving 'the legal rights of litigants in actual controversies." *Genesis Healthcare Corp. v. Symczyk*, 133 S. Ct. 1523, 1528, 185 L. Ed. 2d 636 (2013); *Arizonans for Official English v. Arizona*, 520 U.S. 43, 64 (1997). "To qualify as a case fit for federal-court adjudication, 'an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'" *Arizonans for Official English*, 520 U.S. at 67 (citations omitted).  This requirement ensures that the Federal Judiciary confines itself to its constitutionally limited role of adjudicating actual and concrete disputes, the resolutions of which have direct consequences on the parties involved.  *Genesis Healthcare Corp.,* 133 S. Ct. at 1528.

15

"If an intervening circumstance deprives the plaintiff of a 'personal stake in the outcome of the lawsuit,' at any point during litigation, the action can no longer proceed and must be dismissed as moot." *Id.* (citing *Lewis Cont'l Bank Corp.*, 494 U.S. 472, 477-78 (1990)).  The Eight Circuit has likewise defined "case or controversy" to require "a definite and concrete controversy involving adverse interests at every stage in the litigation."  *Gray v. City of Valley Park*, 567 F.3d 976, 983 (8th Cir. 2009).

Under these principles, "a federal court has neither the power to render advisory opinions nor 'to decide questions that cannot affect the rights of litigants in the case before them.'"  *Ringo v. Lombardi,* 677 F.3d 793, 796 (8th Cir. 2012) (applying case and controversy principles to dismiss a claim for declaratory relief).  The burden is on the party seeking a declaratory judgment to establish that jurisdiction over its declaratory action existed at, and has continued since, the time the complaint was filed.  *Streck, Inc. v. Research & Diagnostic Sys., Inc.,* 658 F. Supp. 2d 988, 998 (D. Neb. 2009).  Here, the Nebraska Supreme Court already resolved all controversies between the parties.

**B.     The Nebraska Supreme Court's Order of December 6, 2013 Rendered Plaintiff's Claims Moot.**

Prior to filing this action, Plaintiff also sought relief by filing a Petition for Rulemaking in the Nebraska Supreme Court.  Pursuant to its Order of December 6, 2013, the Nebraska Supreme specified that the primary purpose of the NSBA is to "assist in the collection and distribution of Nebraska Supreme Court mandatory membership assessments used to pay all costs associated with the Court's regulation of the practice of law."  (Doc. #54-1, p. 37).  This amendment is found at Neb. Ct. R. § 3-803 (2014).  (DSOMF, ¶37-40).

There is no longer any active case or controversy in this matter.  By this action, Plaintiff demanded only prospective injunctive relief to cure alleged constitutional deficiencies in the

16

NSBA's Legislative Program, which was funded, in part, with mandatory NSBA membership dues. (Doc. #1). Plaintiff's lawsuit is based entirely on the central allegation that a portion of NSBA mandatory dues are used to fund political, ideological, and other non-germane activities ("non-chargeable activities") that Plaintiff does not support. (Doc. #1, ¶2). Given the recent changes to the Nebraska Supreme Court Rules, however, Plaintiff's central allegation is no longer debatable amongst the parties—mandatory dues are to be used only to fund clearly "chargeable" activities related directly to regulation of the legal profession.

By its Order, the Nebraska Supreme Court further clarified that mandatory membership dues be used <u>only</u> for the limited purpose of regulating the legal profession. The Court found that this purpose "clearly includes the functions of (1) admitting qualified applicants to membership in the Bar Association, (2) maintaining the records of membership, (3) enforcing the ethical rules governing the Bar Association's members, (4) regulating the mandate of continuing legal education, (5) maintaining records of trust fund requirements for lawyers, and (6) pursuing those who engage in the unauthorized practice of law." (Doc. #54-1, p. 19). Plaintiff does not dispute that these limited activities are germane to the proper purposes of a bar association. (*See* Plaintiff's Memo).

The Nebraska Supreme Court explicitly stated that it intentionally restricted the use of mandatory NSBA member dues to activities related to regulating the legal profession to avoid an item-by-item "germaneness" analysis under *Keller*. In so finding, the Nebraska Supreme Court reasoned:

> By limiting the use of mandatory assessments to the arena of regulation of the legal profession, we ensure that the Bar Association remains well within the limits of the compelled-speech jurisprudence of the U.S. Supreme Court and avoid embroiling this court and the legal profession in unending quarrels and litigation over the germaneness of an activity in

17

> whole or in part, the constitutional adequacy of a particular opt-in or opt-out system, or the appropriateness of a given grievance procedure.

(Doc. #54-1, pp. 19-20).

The Court then clarified that all other NSBA purposes enumerated in the Supreme Court Rules are to be funded by voluntary member dues.  (Doc. #54-1, p. 20).  In short, the Nebraska Supreme Court prohibited the NSBA from supporting many of its existing programs, including its Legislative Program, a part of which includes lobbying, with mandatory NSBA dues.  (*Id.*)  As of January 2014, the NSBA collects mandatory member dues in the significantly reduced amount of $25.00 for active members, an additional $60.00 disciplinary assessment and a $13.00 assessment to regulate the unlicensed practice of law.  *See* Neb. Ct. R. §3-803(D) (2014).  Mandatory dues may not be allocated to the Legislative Program or any other NSBA activity not specifically related to the regulation of the legal profession as defined by the Nebraska Supreme Court. (DSOMF, ¶37-40).

The NSBA Legislative Program is therefore no longer funded with mandatory membership dues.  (DSOMF ¶3-4).  As such, this case is no longer appropriate for federal court adjudication and should be resolved by summary judgment in favor of Defendants.  *See Genesis Healthcare Corp.,* 133 S. Ct. at 1528.

### C.   Plaintiff's Claims Do Not Fall Within the Limited Exception to the Mootness Doctrine.

Presumably, Plaintiff continues to seek declaratory and injunctive relief by invoking the exception to the mootness doctrine, whereby the injury or issue is "capable of repetition yet evading review."  (*See* Plaintiff's Memo, p. 8-10).  There is no merit to any contention that Plaintiff's claims fall within the exception.   This limited exception applies only where "(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, *and* (2) there is a reasonable expectation that the same complaining party will be subject to the

18

same action again." *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007) (Roberts, C. J.) (emphasis added).

The first prong is satisfied where "the challenged activity is *by its very nature short in duration*, so that it could not, or probably would not, be able to be adjudicated while fully live." *Clark v. Brewer*, 776 F.2d 226, 229 (8th Cir. 1985) (emphasis in original) (internal quotation marks omitted). The second prong requires a "reasonable expectation" or a "demonstrated probability" that the "same controversy will recur involving the same complaining party." *Id.* Both prongs must be established in order for the exception to apply and the party asserting that the exception applies has the burden to show that it is applicable. *Hickman v. Missouri*, 144 F.3d 1141, 1142-43 (8th Cir. 1998).

Here, there is no recurring alleged injury, there is no injury that is inherently short, nor is there a reasonable expectation or demonstrated probability that the Nebraska Supreme Court will amend its Rules again, permitting the NSBA to utilize mandatory assessments for activities other than the clearly germane purpose of regulating the legal profession. The NSBA has operated under its current Legislative Program for decades, and its rules governing the NSBA have been in place since 1937. (DSOMF, ¶1). These are not issues addressed lightly or often amended by the Nebraska Supreme Court. (DSOMF, ¶¶31-36). As such, this case does not fall within the "evading review" exception. *Hickman,* 144 F.3d at 1142-43.

Plaintiff argues that this case presents a live controversy with regard to his 2013 bar dues. (Plaintiff's Memo., p. 8). Plaintiff cites to *Preiser v. Newkirk*, 422 U.S. 395 (1975). In *Presier*, however, the Supreme Court applied the second prong of the "capable of repetition yet evading review" test to <u>vacate</u> declaratory relief entered for the plaintiff, and remand the case to the district court with instructions to dismiss the complaint as moot. *Preiser,* 422 U.S. 402-04.

(Plaintiff's Memo, p. 9).  Plaintiff also cites to *Chicago Teacher's Union v. Hudson*, 475 U.S. 292, 300-302 (1985), where the Court found that an escrow of union member mandatory fees was an insufficient procedure to protect the First Amendment rights of objecting members to expenditures on non-chargeable activities.

However, here, the NSBA does not purport to use the short-term escrow of Plaintiff's 2013 dues as a standard procedure to alleviate member objections; rather, it was a unique procedure employed by the parties, as suggested by the Court, to resolve Plaintiff's preliminary injunction demand.  (Doc. #33).  Plaintiff's constitutional claims are not resolved solely by this escrow (a solution disapproved by *Hudson*), but rather are <u>completely</u> resolved by the wholesale revisions to the scope NSBA activities to be funded by mandatory dues, as set forth in the Nebraska Supreme Court Rules.

Plaintiff deposited $275.00, his 2013 membership dues, in his trust account upon a stipulation of the parties. However, the NSBA does not intend to seek these dues and has explained as much to Plaintiff.  (DSOMF, ¶¶43-44).  "A party may not, by its own conduct, create the appearance of an actual controversy in order to avoid mootness."  *B.J.S. ex rel. N.S. v. State Educ. Dep't/Univ. of State of N.Y.*, 815 F. Supp. 2d 601, 613 (W.D.N.Y. 2011).  Plaintiff's 2013 dues do not present an issue evading review, nor do they present a live controversy for adjudication.

Each of the issues raised in Plaintiff's Complaint was resolved in its entirety by the Nebraska Supreme Court's Order restricting the use of mandatory dues to activities regulating the legal profession.  Absent a justiciable Article III case or controversy, the Court must grant summary judgment in favor of Defendants, or dismiss Plaintiff's Complaint for lack of subject matter jurisdiction.

III.   **The 2013 NSBA Practices and Procedures For Funding its Legislative Program Were Constitutionally Valid.**

Even if this Court were inclined to issue an advisory opinion concerning the constitutionality of the NSBA's Legislative Program, as it used to exist, that program was constitutionally sound.  Plaintiff cites several alleged deficiencies in the NSBA practices and procedures as they existed in 2013; however, Plaintiff advocates an extremely narrow and legally unsupportable definition of what constitutes a "chargeable" expenditure for a bar association. For the reasons set forth below, the NSBA 2012 Legislative Program & Policy Statement, as written and implemented by the NSBA, appropriately protected the First Amendment interests of its members, while permitting the NSBA to engage in its own protected speech activities.

A.   **The NSBA May Use Mandatory Member Dues For Germane Legislative Activities, Including Lobbying on Subjects Germane to the Purposes of the NSBA and Disseminating Information on Pending Legislation.**

The United States Supreme Court has held that certain mandatory associations are permitted under the First Amendment because compelled membership serves legitimate governmental purposes for the benefit of all members.  *See, e.g., Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 234 (1977).  "Mandatory" or "unified" bars, under which dues-paying membership is required as a condition to practice law in a state, are permitted under this theory.  *See Lathrop v. Donohue*, 367 U.S. 820 (1961); *see also Morrow v. State Bar of California,* 188 F.3d 1174, 1176-1177 (9th Cir. 1999).

When individuals object to certain uses of their mandatory dues, but must remain members of the group by law or necessity, the Supreme Court applies a balancing test to ensure that the required financial support of members is used only to further the important state interests that justify compelled membership.  *See Keller v. State Bar of Cal.,* 496 U.S. 1, 17 (U.S. 1990). The *Keller* Court explained the purposes justifying mandatory bar associations and the

21

appropriate balancing required to evaluate whether an association expenditure is "necessarily and reasonably incurred" to further these goals, and is therefore properly "chargeable" to mandatory membership dues:

> [T]he compelled association and integrated bar is justified by the State's interest in <u>regulating the legal profession</u> and <u>improving the quality of legal services.</u>  The State Bar may therefore constitutionally fund activities germane to those goals out of the mandatory dues of all members.  It may not, however, in such manner fund activities of an ideological nature which fall outside of those areas of activity.  The difficult question, of course, is to define the latter class of activities. . . .

> Precisely where the line falls between those State Bar activities in which the officials and members of the Bar are acting essentially as professional advisors to those ultimately charged with the regulation of the legal profession, on the one hand, and those activities having political or ideological coloration which are not reasonably related to the advancement of such goals, on the other, will not always be easy to discern.

*Keller*, 496 U.S. at 14 (internal quotations omitted).  The difficulty in this balancing test was recently acknowledged again in *Kingstad v. State Bar of Wisconsin*:

> [I]n a forced group speech case, the First Amendment requires a reviewing court to consider whether challenged expenditures by dissenting members of a mandatory association are reasonably related to the constitutionally relevant purposes of that association. It is not sufficient to examine only the political or ideological nature of those expenditures without <u>also</u> considering whether the expenses are related to the constitutionally legitimate purposes of the association that permit forced group speech in the first place. The applicable cases do not describe the analysis as a test of "either-or," as in "either" the expenditures are non-political and non-ideological "or" they are non-germane before they implicate the First Amendment. Rather, the key is the overall "germaneness" of the speech to the governmental interest at issue. The political or ideological nature of the speech factors into that ultimate analysis.

622 F.3d 708, 716 (7th Cir. 2010) (emphasis added).

 *Keller* and *Kingstad* each make clear that legislative activities are not, *ipso facto*, non-germane, non-chargeable activities.  On the contrary, those cases acknowledge that legislative

action may be funded by mandatory dues, unless the conduct at issue is non-germane to the dual purposes of a bar association as set forth in *Keller.  See also Popejoy v. New Mexico Bd. of Bar Comm'rs,* 887 F. Supp. 1422, 1430 (D.N.M. 1995) ("even if a given activity possesses communicative content of a political or ideological nature, it may nevertheless be reasonably related to the practice of law, to the regulation of the legal system, or to the improvement of legal services.")

Illustrating this principle, the appellate courts have identified numerous permissible areas for bar association lobbying, including: (1) questions concerning the regulation of attorneys; (2) budget appropriations for the judiciary and legal aid; (3) proposed changes in litigation procedures; (4) regulation of attorneys' client trust accounts; and (5) law school and Bar admission standards.  *Gibson v. The Florida Bar,* 798 F.2d 1564, 1569 (11th Cir. 1986). Likewise, courts have found that a host of legislative activities dealing with politically sensitive issues fall within the dual purposes set forth in *Keller* and are, therefore "chargeable."  *See Schneider v. Colegio de Abogados de Puerto Rico,* 917 F.2d 620, 632 (1st Cir. 1990)  (dues-financed lobbying for increased appropriations for judicial positions, for increased salaries for government attorneys, for the certification of legal specialists, or against restrictions on attorney advertising, are permissible under the First Amendment because such lobbying is limited to regulating the legal profession or improving the quality of legal services).  Plaintiff's insinuation that all legislative activities are non-germane to a bar association's purposes is flatly incorrect.

In addition to direct lobbying on bills addressing germane subjects (*i.e.* regulation of attorneys, legal aid budgets, litigation procedures), the NSBA is also empowered to safeguard the professional interests of its members and to apprise them of changes in jurisprudence and reforms in the law.  *See* Neb. S.Ct. R. §3-802.  Nothing could be more germane to the purposes

and goals of a state bar association than staying apprised of the status of the law, informing its members about legislation that will affect their practice and urging enactment of legislation that places Nebraska lawyers on an even footing with those outside of the State.

Under the NSBA's 2012 Legislative Program, information concerning pending legislation, including the status of a bill and the NSBA's position, if any, was distributed by e-mail to all NSBA members by Legislative Counsel on a weekly basis during the legislative session through the NSBA's Legislative Update. (DSOMF, ¶11). Information concerning the legislative session, including each bill introduced, was also summarized by Legislative Counsel and distributed to all members in periodic Legislative Summaries. (Id.) NSBA staff members were likewise responsible for administrative tasks designed to facilitate review legislation and disseminate information to NSBA membership and appropriate committees. (DSOMF, ¶12). These Updates and Summaries, of course, required considerable work by Legislative Counsel and NSBA staff to ensure members stayed informed of the current legislative environment. (DSOMF, ¶¶8-12).

Plaintiff asserts, however, that any and all activities undertaken by Legislative Counsel and any activities of NSBA staff touching on the debate, consideration, or dissemination of information concerning legislative issues are necessarily non-chargeable. (Plaintiff's Memo, pp. 34-35).[2] However, this is not the holding of *Keller* and its progeny. Plaintiff relies heavily on the definition of "chargeable" expenditures in the context of union collective bargaining. (Plaintiff's Memo. pp. 25-26).[3] The purposes of bar associations differ from union shops and, as

---

[2] Plaintiff appears to intentionally ignore that NSBA's Legislative Counsel, Mueller Robak, primarily provides information concerning all pending legislation, and "lobbying" on behalf of the NSBA is only a small portion of its role.

[3] *See also* Plaintiff's Memo, p. 33 n.24, asserting that the NSBA Legislative Update does nothing to regulate the legal profession or improve the quality of legal services, but citing *Lehnert*, a case addressing union shops, in support of this proposition. The dissemination of important information to attorneys is absolutely a germane purpose of a bar association. *See Thiel*, 94 F.3d at 405.

24

such, those activities "germane" to bar associations have been interpreted more broadly. *See Kingstad,* 622 F.3d at719 ("the purposes supporting mandatory union dues (collective bargaining and grievance resolution) and a mandatory bar (regulating the profession and improving legal services) are very different.")

Ironically, after citing *Kingstad* extensively for the proposition that the "germaneness" analysis controls, Plaintiff declines to address the actual holding of that case, which is that a state bar's public image campaign is germane to the bar's constitutionally legitimate purpose of improving the quality of legal services available to the public. *Kingstad,* 622 F.3d at 721. The *Kingstad* Court also cited favorably to its decision in *Thiel v. State Bar of Wisconsin*, 94 F.3d 399, 405 (7th Cir. 1996), where the court found that activities such as (1) publishing and distributing a Bill of Rights pamphlet for pre-college students, (2) conducting an "economics of practice" survey designed to help lawyers address business decisions related to the practice of law, (3) funding awards given to reporters for writing on law-related topics, (4) sponsoring a group to assist alcoholic lawyers, (5) local bar grants, and (6) sponsoring a mock trial competition to each be "germane" to the dual purposes of bar associations. *Id. Kingstad* also cites favorably to the "generous" definition of germane activities identified in *Gardner v. State Bar of Nevada*, 284 F.3d 1040, 1043 (9th Cir. 2002), where the court held that it is "no infringement of a lawyer's First Amendment freedoms to be forced to contribute to the advancement of the public understanding of law."

Here, however, Plaintiff asks this Court to find that the full scope of administrative tasks of Legislative Counsel and NSBA staff designed to analyze pending bills and disseminate information to bar membership are <u>not</u> germane and, therefore, not chargeable. In support of this proposition, Plaintiff engages in an odd tautology where he submits that broad categories of

25

NSBA expenditures are non-chargeable, because they are spent on "non-chargeable lobbying" (subparagraphs 1) or "non-chargeable legislation" (subparagraphs 2, 3, and 4) (Plaintiff's Memo, pp. 34-35).[4]

Plaintiff's analysis apparently begins with the presumption that *some* bills will necessarily touch on substantive issues not germane to the NSBA and, therefore, any discussion, debate or consideration of the Nebraska legislature's agenda is not chargeable.  Under Plaintiff's blunt analysis, presumably, where a bill deals with a subject matter <u>clearly germane</u> to the NSBA (*see e.g.,* Doc. #63-1, Ex. 5, p. 7. LB302, referencing NSBA support for a bill proposing a restructuring plan for the court system), every example of "non-chargeable" administrative activity by Legislative Counsel and NSBA staff would be "chargeable."  It is not clear, however, how Plaintiff proposes that the NSBA should reach a determination as to whether a bill's subject matter is "germane" without actually considering the content of the bill and analyzing its effect on the legal profession.

Plaintiff's analysis approaches the *Keller* balancing test exactly backwards.  *Keller* did not define bar association activities such as information sharing, deliberation and analysis as "non-chargeable;" it addressed situations where compulsory dues were used by a bar association to "endorse or advance" a non-germane cause, thus subjecting members to forced speech on their behalf.  *See Keller*, 496 U.S. at 16.  That is, *Keller* is concerned with compelled "expressive activities" as defined by First Amendment jurisprudence. "In *Abood* and *Keller,* the constitutional rule took the form of limiting the required subsidy to <u>speech</u> germane to the

---

[4] Plaintiff also notes that NSBA "staff" occasionally testifies in the legislature.  Under the NSBA Legislative Program, as it existed in 2013, NSBA officers sometimes offered testimony in the Nebraska legislature when the NSBA had taken a formal position on a bill pursuant to the 2012 Legislative Program & Policy Statement. However, NSBA officers were never compensated with NSBA membership dues.  (DSOMF, ¶46).  Similarly, NSBA members serving in the NSBA House of Delegates, Executive Council and Legislation Committee were volunteers and were not compensated with NSBA membership dues. (Id.)  As such, this testimony on bills deemed germane under the Legislative Program did not implicate "non-chargeable" expenditures of members' dues.

26

purposes of the union or bar association." *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 231 (2000) (emphasis added).  Of course, an objecting member "may insist upon certain safeguards with respect to the <u>expressive activities</u> which they are required to support," where the expressive activities are not germane to the purposes of the association.  *Id.* at 229 (emphasis added).[5]

The NSBA's Legislative Program was not an "expressive activity" in and of itself.  This program can be viewed as a "funnel" to collect, analyze and disseminate information concerning pending bills in the Nebraska legislature.  At the top of the funnel, Legislative Counsel collects information about the basic proposal found in each bill and forwards to the NSBA Legislation Committee those bills that may be germane to the NSBA's purposes.  In the middle of the funnel, the NSBA considers the proposal through its Legislation Committee, Executive Council and House of Delegates.  At the bottom of the funnel, the NSBA takes a position on those issues found to be germane to the purposes of the NSBA.  The "output" of the funnel is Legislative Counsel's lobbying and direct advocacy engaging the legislature on those limited issues where the NSBA has taken a formal position.

Plaintiff complains about the very existence of this "funnel" system in 2013, but the vast majority of activities about which Plaintiff complains were not "expressive activities" protected under the compelled speech rubric of *Keller*.  Only if the NSBA House of Delegates voted on a formal position and authorized its Legislative Counsel to actively lobby for legislation that is <u>not germane</u> to the dual purposes set forth in *Keller* did the NSBA engage in non-chargeable activities—thereby implicating other NSBA procedures designed to segregate funds for

---

[5] "The central holding in *Keller,* moreover, was that the objecting members were <u>not required to give speech subsidies</u> for matters not germane to the larger regulatory purpose which justified the required association." *United States v. United Foods, Inc.,* 533 U.S. 405, 414 (2001) (emphasis added).

potentially non-chargeable expenditures. Until that point, the NSBA engaged in the non-expressive activities of staying apprised of the political process, considering the merits of various issues that will affect the interests of its members and informing its members of pending legislation, all germane activities under the dual purposes set forth in *Keller*.

Defendants submit that administrative tasks performed by Legislative Counsel to analyze, summarize and communicate the status of pending bills to NSBA officers and membership was a chargeable activity. Administrative tasks by NSBA staff to review, consider, and communicate about the content of pending legislation was also germane. Simply put, these non-political, non-ideological, non-expressive elements of the NSBA's Legislative Program were properly chargeable in that they did not infringe on the First Amendment rights of its members and also were entirely germane activities that furthered the NSBA's "interest in regulating the legal profession and improving the quality of legal services." *Keller*, 496 U.S. at 14.

As such, Plaintiff's sweeping pronouncement that all legislative activities were non-chargeable should be rejected, and judgment granted in favor of Defendants as to these chargeable activities.

**B.   The NSBA May Use Mandatory Member Dues For Limited Social Activities, Conferences and Publications Because Such Activities are Germane to the Purposes of the NSBA.**

Plaintiff also criticizes the NSBA for engaging in limited social activities and circulating publications funded, in part, with mandatory bar dues, while recognizing that these activities have been identified as germane in the context of union shops. (*See* Plaintiff's Memo, pp 26-27, 37-39). As explained by the Supreme Court, "[t]hese small expenditures are important to the union's members because they bring about harmonious working relationships, promote closer ties among employees, and create a more pleasant environment for union meetings." *Ellis v. Bhd. of Ry., Airline & S.S. Clerks, Freight Handlers, Exp. & Station Employees*, 466 U.S. 435, 449-50

28

(1984). Likewise, publications are important to the purposes of the NSBA, including keeping its members apprised of its own activities. *Id.* at 450 ("The union must have a channel for communicating with the employees, including the objecting ones, about its activities.") These types of social activities and publications are germane in the context of a bar association, just as they are germane in the context of union shops.

In short, Plaintiff's argument answers itself. Limited social activities, an annual planning conference and publications are germane to the purposes of the NSBA. Judgment should be granted in favor of Defendants as to these chargeable activities as well.

**C.     Under its 2012 Legislative Procedure & Policy Statement, Legislative Check-Off and Grievance Procedures, the NSBA Established Adequate Procedures to Protect the Constitutional Rights of its Members.**

Plaintiff also asserts that the NSBA supported political and ideological legislation that is "non-germane." (*See* Plaintiff's Memo, p. 31, citing four bills that the NSBA lobbied over the last two years that Plaintiff claims are not germane to the purposes of the NSBA). Assuming *arguendo* that the NSBA has taken positions on certain matters that are not "germane" as established by the dual purposes set forth in *Keller,* the instances where this occurs are very limited. Under its Legislative Program & Policy Statement, the Legislation Committee, Executive Council and House of Delegates each reviewed pending legislation to determine if it was "germane" to the purposes of the NSBA. (DSOMF, ¶¶13-16). Where deemed not germane, the NSBA generally took no position on the bill. (DSOMF, ¶13).

Even if the NSBA had taken positions on particular bills not germane to the NSBA's purposes, this conduct is not, in and of itself, a constitutional violation. *Keller*, 496 U.S. at 17. So long as certain procedural protections ensure that no dissenting member is forced to pay for such speech, a bar association may participate in these activities. *Id.* Here, the NSBA had enacted constitutionally adequate procedures to protect against this type of compelled speech.

29

In *Chicago Teachers Union v. Hudson,* 475 U.S. 292 (1986), the Supreme Court outlined a set of constitutionally adequate procedures which a union could employ to prevent improper compelled speech. Where expenditures are not necessarily or reasonably incurred for "germane" organizational purposes, the organization must provide its members with: (1) an adequate explanation of the basis for the fee; (2) a reasonably prompt opportunity to challenge the fee amount before an impartial decision-maker; and (3) an escrow for amounts reasonably in dispute while such challenges are pending. *Id.* at 310.

Contrary to Plaintiff's position, however, the specific procedures considered in *Hudson* are not the exclusive method by which an organization may satisfy its constitutional obligations. (Plaintiff's Memo, pp. 11-12). In *Keller*, the Supreme Court stated: "We believe an integrated bar could certainly meet its *Abood* obligation by adoption the sort of procedures described in *Hudson*. Questions of whether one or more alternative procedures would likewise satisfy that obligation are better left for consideration upon a more fully developed record." 496 U.S. at 17 (emphasis added); *see also Crosetto v. State Bar*, 12 F.3d 1396, 1404 (7th Cir. 1993) (finding an alternate plan to be constitutionally permissible under *Hudson*). Showing non-compliance with the strict language of *Hudson*, therefore, is not dispositive (or even appropriate) to determine a procedure's constitutional adequacy.

Nor, contrary to Plaintiff's assertion, does *Keller* require that this Court apply strict scrutiny and demand that NSBA procedures be narrowly tailored to further a compelling government interest by the least restrictive means. (Plaintiff's Memo, pp. 41-42). The *Keller* Court found that the purposes underlying the collective action of bar associations rest upon sufficiently important interests to justify compelled membership. *Keller,* 496 U.S. 1, at 14. It

30

then applied an intermediate balancing test to evaluate necessary, and therefore properly "chargeable," expenditures in furtherance of those stated purposes. *Id.*

Subsequent cases have confirmed that the *Keller* standard was not intended to invoke more exacting scrutiny than the simple balancing test set forth in that decision. *Kingstad,* 622 F.3d at 720 ("We do not believe the reasonableness test requires federal courts to engage in closer parsing of the State Bar's expenditures."); *Rounds v. Oregon State Bd. of Higher Educ.,* 166 F.3d 1032, 1038 (9th Cir. 1999) ("Because mandatory exactions do not involve personal endorsements, such exacting scrutiny is not required.") (citing *Keller*); *see also Levine v. Heffernan*, 864 F.2d 457, 461-62 (7th Cir. 1988) (overruling district court's application of compelling state interest standard).

The NSBA recognized that taking positions on legislation implicates the free-speech rights of its individual members.  Therefore, the NSBA devised two mechanisms to ensure that objecting members' dues do not fund arguably non-germane portions of the Legislative Program: (a) the Legislative Check-Off and (b) Grievance Procedure.  (DSOMF, ¶¶22-30).

### 1.    The NSBA Legislative Check-Off Procedure complied with *Hudson*.

Notably, the NSBA Legislative Check-Off option went beyond what is required under *Hudson*.  This is because the dues of a member who opts-out of the Association's lobbying activities were segregated from <u>all</u> lobbying activities, even those pertaining to germane issues.

Pursuant to its contract with the NSBA, Legislative Counsel Mueller Robak was responsible for a host of activities, including tracking bills in the legislature, informing NSBA sections and the membership of particular bills of interest and, if a formal position is taken by the NSBA, lobbying the legislature.  (DSOMF, ¶9).  In this role, Mueller Robak engaged in both "chargeable" administrative tasks designed to convey information to the NSBA membership and, perhaps, limited "non-chargeable" lobbying activity if the NSBA has taken a formal position on

31

a non-germane bill. (Id. at ¶10). Mueller Robak calculated that approximately two-thirds of its work on behalf of the NSBA is spent on administrative tasks and about one-third on legislative advocacy. (Id.)

Given that the NSBA Legislative Program & Policy Statement required substantial review of all legislation prior to taking a formal position—including a germaneness analysis— the vast majority of Mueller Robak's legislative advocacy speaks to issues "germane" to the purposes of the NSBA and is therefore fairly "chargeable" to mandatory dues. (DSOMF, ¶¶14-16). However, as asserted by Plaintiff, some portion of this advocacy may involve lobbying on substantive issues not "germane" to the purposes of the NSBA. (Plaintiff's Memo, pp. 34-35).

Rather than parse out whether a particular legislative subject matter was "germane" and "chargeable," the NSBA Legislative Check-Off segregated the funds of objecting members from any legislative advocacy. If checked, the objecting member's dues were not used to fund any of the NSBA's lobbying activities through its Legislative Counsel Mueller Robak—even those lobbying activities which are not political or ideological in nature and are clearly germane to the purposes of the NSBA. (DSOMF, ¶24). Dues paid by NSBA members who had "checked off" were reduced from the NSBA general fund by the percentage attributable to those lobbying activities and segregated from general NSBA expenditures, including such lobbying activities. (Id.) Those segregated funds were placed into the NSBA legislative check off reserve by an accounting journal adjustment. (Id.) Pursuant to contract, the amount paid to Mueller Robak was reduced, on a pro-rata basis, by the amount of the segregated dues. (Id, ¶25).

Thus, the NSBA Legislative Check-Off simply removed a pro-rata share of member dues from legislative advocacy altogether.[6] The legislative check-off reserve was never used for

---

[6] As discussed above, the Legislative Program & Policy Statement provides for a process that contemplates a germaneness analysis by the Legislation Committee, Executive Counsel and House of Delegates before the NSBA

lobbying purposes and never used to pay legislative counsel, Mueller Robak.  (DSOMF, ¶26).
Instead, the legislative check off reserve was only to be accessed by authorization of the
Executive Council for specific NSBA projects that have no relationship to legislative advocacy.
(Doc. #54-1, p. 43, showing amendments to the Nebraska Supreme Court Rule §3-803(D)(2)(b)
as of January 1, 2014).  The legislative check off reserve fund maintained by the NSBA was not
accessed by the NSBA during the period from 2010-2012.  (DSOMF, ¶26).  In short, objecting
members' funds were completely segregated from spending on "non-chargeable" NSBA
activities under the 2013 Legislative Program.

Plaintiff objects to this procedure on the basis that it did not provide Plaintiff with a
refund or rebate of his pro-rata share of 2013 membership dues allocated for lobbying activities
under the NSBA Legislative Check-Off procedure.  (Plaintiff's Memo., pp. 22-24).  However,
*Hudson* requires only that an association provide an escrow for amounts <u>reasonably in dispute</u>
while challenges to its expenditures are pending.  *Hudson*, 475 U.S. at 310 ("there is no reason to
believe that anything approaching a 100% 'cushion' to cover the possibility of mathematical
errors would be constitutionally required.")  Here, the NSBA resolved Plaintiff's concern by
agreeing to place the entirety of Plaintiff's 2013 membership dues into his trust account pending
resolution of this case, (Doc. #33), and by subsequently indicating that the NSBA does not intend
to seek the 2013 dues currently held in Plaintiff's trust account.  (DSOMF, ¶44).  As such,
Plaintiff was adequately protected from having his funds used for "non-chargeable" activities
pending resolution of his claims.

Moreover, the NSBA Grievance Procedure provided a more general method whereby an
aggrieved member can seek recourse if they believe that their mandatory dues are expended on

---

takes a position on pending legislation.  The Legislative Check-Off assumes that objecting members like Plaintiff do
not agree with this analysis, or have some objection to the germaneness of some piece of legislation, and would
prefer that their mandatory dues not fund any lobbying activity.

DB04/0012516.0799/10502824.2

non-chargeable activities.[7]   *Hudson* requires that an objecting member have access to a procedure that will "provide for a reasonably prompt decision by an impartial decisionmaker." *Hudson*, 475 U.S. at 307.   Under the NSBA's procedure, grievances were considered by a Dues Grievance Committee comprised of three NSBA members who were <u>not</u> association officers or members of the House of Delegates, Executive Council, or Legislation Committee, thus ensuring that NSBA officers did not control the review process.   (DSOMF, ¶29).   If the Committee determined that the challenged activity violated the member's rights, the Committee "shall recommend to the Executive Council whether the House of Delegates and Executive Council should cease such activity or refund that portion of the grievant's dues expended for said activity."   (Id., ¶30).   The Executive Council was then required to make a final determination on the grievance within 30 days after receiving the Committee's report.   (Id.)

The Legislative Check-Off and Dues Grievances procedures, taken together, properly ensured that objecting member's mandatory dues are not spent on non-chargeable lobbying activities and this procedure was therefore constitutionally valid.

### 2.   The NSBA opt-out system was constitutionally valid.

Plaintiff also contends that the Legislative Check-Off procedure was inadequate under the recent Supreme Court decision in *Knox v. SEIU, Local 1000.*   (Plaintiff's Memo, pp. 41-44). In *Knox*, non-union public sector employees affiliated with the union under an "agency shop" arrangement were charged a mandatory special assessment for use in electoral campaigns.   132 S. Ct. 2277 (2012).   In finding that an "opt-in" should be provided prior to collection of such assessments, the Court reasoned:

> *Hudson* rests on the principle that nonmembers should not be required to
> fund a union's political and ideological projects unless they choose to do

---

[7] Notably, Plaintiff recognizes that he did not utilize this grievance procedure and instead brought this lawsuit. (Plaintiff's Memo, p. 21).   As such, Plaintiff lacks standing to challenge this provision.

> so after having "a fair opportunity" to assess the impact of paying for
> nonchargeable union activities.  Giving employees only one opportunity
> per year to make this choice is tolerable if employees are able at the time
> in question to make an informed choice.

*Id.* at 2291-2292 (internal citations omitted).

Thus, *Knox* stands for the proposition that an annual "opt-out" or "opt-in" system is acceptable, so long as the system provides a "fair opportunity" for members to assess whether they wish to allocate their dues to non-chargeable or non-germane activities.  *Knox* does not require an annual "opt-in" system, as opposed to an "opt-out" system, as suggested by Plaintiff. Moreover, as discussed below, unlike the union in *Knox*, the NSBA did not charge special assessments and it regularly informed its members about Legislative Program activities, such that all members had a fair opportunity to make an informed decision as to whether they wished to "opt-out" on an annual basis.  (DSOMF, ¶¶8-9, 11-12, Doc. #63-1, Ex. 12, 14, 17, and 23).

Thus, the NSBA Legislative Check-Off is consistent with *Hudson*, and was not abrogated by the recent *Knox* decision.  For this reason as well, the NSBA Legislative Program complied with applicable constitutional standards, and judgment should be granted in favor of the NSBA on this issue.

> **3.**    **The NSBA provided adequate notice to its members concerning its lobbying activities prior to collecting mandatory dues, providing members with an opportunity to opt-out of compelled speech activities.**

Under *Hudson*, the association should provide its members with "sufficient information to gauge the propriety of the union's fee," often referred to as a *Hudson* notice.  *Hudson,* 475 U.S. at 306.  The Court recognized that there are practical reasons why "[a]bsolute precision" in the calculation cannot be expected or required, and that the association need not provide objecting members "with an exhaustive and detailed list of all its expenditures."  *Id.* at 307 n.18.

35

Instead, the Court found that an adequate disclosure would include the major categories of expenses, as well as verification by an independent auditor.  *Id*.

Under its Legislative Program, the NSBA provided weekly Legislative Updates and regular Legislative Summaries to inform its membership of each bill upon which the NSBA took a formal position (DSOMF, ¶¶8-9, 11-12)—thus allowing members to inquire about funding for the Legislative Program, or object to NSBA expenditures on a regular basis.  Prior to receiving the annual dues statement, NSBA members were also given access to various sources of information concerning NSBA expenditures of mandatory member dues for the prior year including the NSBA's Statement of Activities, NSBA's Annual Budget, and the NSBA's annual audit made available to all NSBA members upon request.  (DSOMF, ¶45).

The NSBA Statement of Activities in particular provided all members with a line item clearly identifying those NSBA dues segregated under the Legislative Check-Off and attributed to any potentially "non-chargeable" lobbying activities of Legislative Counsel, Mueller Robak.  (*See* Doc. #63-1, Ex. 17).  Likewise, the NSBA's Annual Budget clearly provided the major categories of NSBA expenses, as verified by an independent auditor.  (*Id*. at Ex. 14).  These notifications to all members met the explicit requirements of *Hudson*, and judgment should be granted in favor of the NSBA on this issue as well.

### D.    Plaintiff Was Not Denied Any Due Process Right as Provided by *Keller* and *Hudson*.

As set forth herein, the NSBA Legislative Program complied with the requirements of *Keller* and *Hudson*.  Furthermore, Plaintiff has not been denied any right, as he has not been ordered to remit his 2013 fees to the NSBA.  Moreover, Plaintiff sought only prospective relief, such that Plaintiff's allegations of prior constitutional violations are irrelevant.  For these reasons,

36

Plaintiff's Motion for Summary Judgment on his Due Process claim must be denied, and Defendants Cross-Motion for Summary Judgment granted.

## CONCLUSION

Plaintiff's Motion for Summary Judgment must, first, be denied as moot.  Plaintiff's Complaint requested prospective relief only and such relief was granted by the Nebraska Supreme Court, thus resolving any doubt that current NSBA practices and policies meet constitutional standards.  Plaintiff's request for a *post hoc* analysis of NSBA procedures as they existed in 2013 must be denied as the Court no longer has subject matter jurisdiction to hear Plaintiff's claims.  NSBA does not intend to seek to recover the $275.00 in Plaintiff's 2013 membership dues currently held in Plaintiff's trust account and the NSBA Legislative Program is no longer funded with mandatory membership dues.  There is no longer and case or controversy pending before this Court.

Furthermore, even were the Court were inclined to issue an advisory opinion concerning the NSBA's Legislative Program as it existed in 2013, that program did not deny Plaintiff any constitutional right.  The NSBA Legislative Program properly defined "chargeable" activities as set forth in *Keller,* segregated objecting members' dues and informed members concerning NSBA spending activities.  The NSBA also provided a Grievance Procedure for objecting members to challenge NSBA spending activities—a procedure that Plaintiff never utilized.  For the foregoing reasons, Plaintiff's Motion for Summary Judgment should be denied, and Defendants' Cross-Motion for Summary Judgment should be granted.

DB04/0012516.0799/10502824.2

Respectfully Submitted,

**STINSON LEONARD STREET LLP**

By:___/s/ Bryan S. Hatch_____
John R. Munich, #31474MO (admitted *pro hac vice*)
Jamie Boyer, #55209MO (*pro hac vice* in process)
7700 Forsyth Blvd., Suite 1100
St. Louis, Missouri 63105
Telephone:  314-863-0800
Fax:  314-863-9388
john.munich@stinsonleonard.com
jamie.boyer@stinsonleonard.com

Bryan S. Hatch, #21009
1299 Farnam St., Suite 1500
Omaha, Nebraska 68102
Telephone:  402-930-1709
Fax:  402-930-1701
bryan.hatch@stinsonleonard.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of March, 2014, the foregoing was filed electronically with the Clerk of Court to be served on all parties of record by operation of the Court's electronic filing system.

_____/s/ Bryan S. Hatch_____
Bryan S. Hatch

DB04/0012516.0799/10502824.2