# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEBRASKA

SCOTT LAUTENBAUGH,                          )
                                            )
                      Plaintiff,            )   No. 4:12-cv-03214-RGK
                                            )
           v.                               )   **PLAINTIFF'S RESPONSE/REPLY TO**
                                            )   **DEFENDANTS' RESPONSE AND CROSS-**
NEBRASKA STATE BAR                          )   **MOTION FOR SUMMARY JUDGMENT**
ASSOCIATION, *et al.,*                      )
                                            )
                      Defendants.           )
                                            )
                                            )
_____            )

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................... v

INTRODUCTION ............................................................................... 1

ARGUMENT ...................................................................................... 1

I. THERE IS STILL A LIVE CASE OR CONTROVERSY
REGARDING MR. LAUTENBAUGH'S 2013 DUES................................. 1

    A. The Nebraska Supreme Court's Rule Change Did Not Render
This Case Moot ................................................................. 1

    B. Mr. Lautenbaugh's 2013 Dues Remain In His Trust Account,
And An Order From This Court Directing The Dispersal Of
Those Funds Is Necessary ................................................. 3

    C. Because There Is A Live Case Or Controversy, The NSBA's
Construction Of Straw Men Exceptions To The Mootness
Doctrine Are Inapplicable Here ........................................ 5

II. THE NSBA'S PROCEDURES DID NOT COMPLY WITH
*HUDSON*, AND THE NSBA DID NOT PROVIDE "ALTERNATIVE
PROCEDURES" SUFFICIENT TO MEET *HUDSON*'S MINIMUM
THRESHOLD............................................................................ 6

    A. The NSBA Failed To Provide Disclosures Sufficient For
NSBA Members To Determine Whether Or Not To Object To
The NSBA's Chargeability Determinations ...................... 6

    B. The NSBA Failed To Provide An Impartial Grievance
Procedure To NSBA Members ......................................... 11

    C. The NSBA Was Required To Provide A Rebate Or Refund Of
The Portion Of Mandatory Member Dues Slated For Non-
Chargeable Activities ...................................................... 13

III. THE NSBA WAS NOT ENTITLED TO COLLECT MANDATORY
DUES IN THE ABSENCE OF CONSTITUTIONALLY ADEQUATE
PROCEDURES............................................................................ 16

IV.    THE EFFECT OF THE NSBA'S PRACTICES AND PROCEDURES IN 2013 WAS THAT MANDATORY MEMBER DUES WERE EXPENDED ON NON-CHARGEABLE ACTIVITIES .............................. 17

    A.    The NSBA's Definition Of Activities That May Permissibly Be Funded By Dissenting Members' Dues Is Impermissibly Narrow ........................................................................................... 18

    B.    The NSBA Offers An Inadequate Basis For The Chargeability Of Some Of Its Activities, And Completely Ignores The Chargeability Of Other Activities ...................................................... 20

        i.    The Social Activites Conducted By The NSBA Were Neither *De Minimis* Nor Chargeable ..................................... 21

        ii.    The Publications Of The NSBA Were Not Chargeable Merely Because They Informed NSBA Members Regarding Legislation ........................................................... 22

        iii.    The NSBA's Attempt To Gloss Over The Remainder Of Its Non-Chargeable Activities By Characterizing Them As Non-Expressive Has No Basis In The Law ........... 23

    C.    The NSBA's Legislative Check-Off Reserve Did Not Prevent Dissenting Members' Dues From Being Spent On Non-Chargeable Activities In 2013 ........................................... 24

    D.    NSBA Members' Freedom To Engage In Speech Independent Of The NSBA Did Not Exempt The NSBA From Constitutional Requirements ............................................................ 25

V.    THE *KELLER* GERMANENESS ANALYSIS IS THE APPROPRIATE STANDARD OF REVIEW FOR MANDATORY BAR ASSOCIATION ACTIVITIES ............................................... 26

VI.    THE NSBA'S OPT-OUT PROCEDURE DID NOT SATISFY THE NARROW TAILORING REQUIRED BY THE SUPREME COURT'S FIRST AMENDMENT JURISPRUDENCE .............................. 28

VII.    THE NSBA'S FAILURE TO PROVIDE CONSTITUTIONALLY ADEQUATE PROCEDURES WILL RESULT IN A DEPRIVATION OF PROCEDURAL DUE PROCESS IF MR. LAUTENBAUGH IS COMPELLED TO PAY THE FULL AMOUNT OF HIS 2013 DUES ........ 30

CONCLUSION ......................................................................................... 31

CERTIFICATE OF SERVICE ................................................................. 32

# TABLE OF AUTHORITIES

**Page**

## Cases

*Abood v. Detroit Bd. of Educ.,*
    431 U.S. 209 (1977)............................................................................ *passim*

*Acevedo-Delgado v. Rivera,*
    292 F.3d 37 (1st Cir. 2002)................................................................ 19

*Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth,*
    529 U.S. 217 (2000)............................................................................ 23

*Bromley v. Michigan Educ. Ass'n-NEA,*
    82 F.3d 686 (6th Cir. 1996) ............................................................... 19

*Chicago Teacher's Union v. Hudson,*
    475 U.S. 292 (1986)............................................................................ *passim*

*College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.,*
    527 U.S. 666 (1999)............................................................................ 29

*Cummings v. Connell,*
    177 F. Supp. 2d 1060 (E.D. Cal. 2001)............................................ 10

*Cummings v. Connell,*
    316 F.3d 886 (9th Cir. 2003) ............................................................ 10

*Damiano v. Matish,*
    830 F.2d 1363 (6th Cir. 1987) .......................................................... 8

*Dashiell v. Montgomery County,*
    925 F.2d 750 (4th Cir. 1991) ............................................................ 10

*Davenport v. Washington Educ. Ass'n,*
    551 U.S. 177 (2007)............................................................................ 6, 27, 30

*Ellis v. Railway Clerks,*
    466 U.S. 435 (1985)............................................................................ *passim*

*Foster v. Mahdesian,*
    268 F.3d 689 (9th Cir. 2001) ............................................................ 10, 14, 19

*Gibson v. The Florida Bar,*
    798 F.2d 1564 (11th Cir. 1986) ........................................................ 17, 28, 29

v

*Golden v. Zwickler*,
 394 U.S. 103 (1969)............................................................. 2

*Hohe v. Casey*,
 956 F.2d 399 (3d Cir. 1992)................................................ 8, 10, 16

*Hudson v. Chicago Teachers Union*,
 743 F.2d 1187 (7th Cir. 1984) .............................................. 13

*In re Pac. Lumber Co.*,
 584 F.3d 229 (5th Cir. 2009) ............................................... 3

*International Ass'n of Machinists v. Street*,
 367 U.S. 740 (1961)............................................................. 29

*Keller v. State Bar of California*,
 496 U.S. 1 (1990)................................................................ *passim*

*Kingstad v. State Bar of Wis.*,
 622 F.3d 708 (7th Cir. 2010) ............................................... 25, 27

*Knox v. Service Employees Intern. Union*,
 132 S. Ct. 2277 (2012)......................................................... *passim*

*Laramie v. County of Santa Clara*,
 784 F. Supp. 1492 (N.D. Cal. 1992) .................................... 7, 11

*Lehnert v. Ferris Faculty Ass'n*,
 500 U.S. 507 (1991)............................................................. *passim*

*Lowary v. Lexington Local Bd. of Educ.*,
 903 F.2d 422 (6th Cir. 1990) .............................................. 13

*Planned Parenthood v. Rounds*,
 530 F.3d 724 (8th Cir. 2008) .............................................. 26

*Popejoy v. New Mexico Bd. of Bar Com'rs*,
 831 F. Supp. 814 (D.N.M. 1993) ........................................ 9–11

*Popejoy v. New Mexico Bd. of Bar Com'rs*,
 867 F. Supp. 1422 (D.N.M. 1995) ...................................... 9

*Porter v. Nussle*,
 534 U.S. 516 (2002)............................................................. 13

*Romero v. Colegio de Abogados de Puerto Rico*,
204 F.3d 291 (1st Cir. 2000) .............................................................. 19, 21, 24

*Schneider v. Colegio de Abogados de Puerto Rico*,
917 F.2d 620 (1st Cir. 1990) .............................................................. 27

*Seidemann v. Bowen*,
499 F.3d 119 (2d Cir. 2007) ............................................................... 28

*Seidemann v. Bowen*,
584 F.3d 104 (2d Cir. 2009) ............................................................... 24

*Swanson v. Univ. of Hawaii Professional Assembly*,
269 F. Supp. 2d 1252 (D. Haw. 2003) ............................................... 16

*Tavernor v. Illinois Federation of Teachers*,
226 F.3d 842 (7th Cir. 2000) .............................................................. 13

*Tierney v. City of Toledo*,
824 F.2d 1497 (6th Cir. 1987) ............................................................ 9, 14

*Trebor Sportswear Co. v. The Limited Stores, Inc.*,
865 F.2d 506 (2d Cir. 1989) ............................................................... 4

*United States v. United Foods, Inc.*,
533 U.S. 405 (2001) ........................................................................... 26

*Vulcan Hart Corp. v. N.L.R.B.*,
718 F.2d 269 (8th Cir. 1983) .............................................................. 4

*Wagner v. Professional Engineers in California Gov't*,
354 F.3d 1036 (9th Cir. 2004) ............................................................ 9

*Weems v. Tyson Foods, Inc.*,
665 F.3d 958 (8th Cir. 2011) .............................................................. 4

*Wessel v. City of Albuquerque*,
327 F. Supp. 2d 1332 (D.N.M. 2004) ................................................. 15

*Wessel v. City of Albuquerque*,
463 F.3d 1138 (10th Cir. 2006) .......................................................... 15

*Wooley v. Maynard*,
430 U.S. 705 (1977) ........................................................................... 26

## Constitutional Provisions

U.S. Const. art. III, § 2 ................................................................................................ 3

## Statutes

42 U.S.C. § 1983 ..................................................................................... *passim*

## Rules

Neb. S. Ct. R. § 3-802(A) ........................................................................ 17

Fed. R. Evid. 408(b) ................................................................................. 4

<u>**INTRODUCTION**</u>

Plaintiff Scott Lautenbaugh's motion for summary judgment should be granted, and Defendants'[1] cross-motion for summary judgment denied, because: (1) this case still presents a live case or controversy; (2) the NSBA has failed to show how its "alternative procedures" complied with the minimum procedural protections mandated by *Chicago Teacher's Union v. Hudson,* 475 U.S. 292 (1986), and applied to mandatory bar associations in *Keller v. State Bar of California,* 496 U.S. 1 (1990); (3) the NSBA conducted significant non-chargeable activities in 2013; (4) the *Keller* standard of germaneness controls determinations of chargeability; (5) the NSBA's opt-out procedure did not comply with the narrow tailoring mandated in *Hudson*; and (6) the NSBA's practices and procedures for collecting mandatory member dues deprived Mr. Lautenbaugh of property without due process of law under the Fourteenth Amendment.  For the reasons previously demonstrated and more fully demonstrated below, Mr. Lautenbaugh respectfully requests entry of judgment declaring that the NSBA's practices and procedures violated his First and Fourteenth Amendment rights as a matter of law and, thus, he is not required to remit any portion of his 2013 dues that remain in his trust account to the NSBA in order to maintain his law license.

<u>**ARGUMENT**</u>

**I.     THERE IS STILL A LIVE CASE OR CONTROVERSY REGARDING MR. LAUTENBAUGH'S 2013 DUES.**

**A.     The Nebraska Supreme Court's Rule Change Did Not Render This Case Moot.**

The NSBA argues that the Nebraska Supreme Court's rule change dispenses fully of the issues before this Court and, thus, the claims set forth in Mr. Lautenbaugh's Complaint are moot.

---

[1] Defendants are the Nebraska State Bar Association, Warren Whitted, Jr., Marsha Fangmeyer, and G. Michael Fenner (collectively, "NSBA").

Filing 65 at CM/ECF pp. 22–24 (hereinafter, "Defs.' Mem."). However, the relief sought by Mr. Lautenbaugh still includes: (1) injunctive relief preventing the NSBA from collecting Mr. Lautenbaugh's 2013 dues, or the non-chargeable portion thereof, under threat of suspending his law license; (2) an adjudication of the amount of Mr. Lautenbaugh's dues that was properly chargeable if this Court determines that any portion of Mr. Lautenbaugh's dues must be remitted to the NSBA; and/or (3) declaratory relief that the NSBA practices and procedures in full force and effect in 2013 were unconstitutional. Filing 62 at CM/ECF pp. 16–17 (hereinafter, "Pl.'s Mem."). These requests for relief constitute a live case or controversy, rather than a request for an "advisory opinion." *Compare* Defs.' Mem. at CM/ECF p. 27 *with Golden v. Zwickler*, 394 U.S. 103, 108 (1969) ("Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy an[d] reality to warrant the issuance of a declaratory judgment.") (internal quotations omitted).

Moreover, the NSBA ignores the basis on which Mr. Lautenbaugh's dues were deposited into his trust account. Defs.' Mem. at CM/ECF pp. 22–23. Mr. Lautenbaugh placed his dues in his trust account in lieu of a preliminary injunction hearing, on the suggestion of this Court. *See* Filings 33, 34. His motion for a preliminary injunction was premised on the argument that the NSBA was not entitled to collect any amount of 2013 member dues until constitutional procedures were in place and operating. Filing 8-1 at CM/ECF pp. 22–23. Mr. Lautenbaugh did not waive that argument by agreeing to deposit his dues into his trust account. *See* Filing 33 at CM/ECF p. 2 ("The parties agree that nothing in this Stipulation shall be construed to be an admission of any kind concerning their respective claims, defenses and positions, and in no

manner otherwise restricts, waives or limits any and all claims or defenses that Plaintiff or Defendants may raise in this case.").

The NSBA's disingenuous assertion that it does not now seek to recover Mr. Lautenbaugh's 2013 member dues is a last-ditch attempt to avoid the jurisdiction of this Court. There is still a live case or controversy pursuant to Article III, Section 2 of the United States Constitution—specifically, whether Mr. Lautenbaugh was required to pay his 2013 member dues in full if unconstitutional practices and procedures for collection of those dues were in place and operating in 2013, or, in the alternative, what portion of Mr. Lautenbaugh's 2013 dues must be remitted to the NSBA to avoid any threat of suspension of his law license. *Cf., In re Pac. Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009) ("Article III mootness concerns arise when a judicial ruling would have no effect."). Because there is still a dispute between the parties, this Court may still award the relief requested in Plaintiff's complaint—albeit, relief limited to a determination of the constitutionality of the NSBA's practices and procedures in 2013. Therefore, Mr. Lautenbaugh submits that this case is not moot.[2]

### B. Mr. Lautenbaugh's 2013 Dues Remain In His Trust Account, And An Order From This Court Directing The Dispersal Of Those Funds Is Necessary.

The NSBA argues this case is moot because, in its mind, there is no longer a justiciable case or controversy. Defs.' Mem. at CM/ECF pp. 21–26. The NSBA bases its argument largely

---

[2] In an attempt to buttress its specious mootness argument, the NSBA argues that this federal action is a "parallel" proceeding to Mr. Lautenbaugh's motion for a rule change filed with the Nebraska Supreme Court and, when filed, was "unnecessary to resolve any perceived constitutional deficiencies in NSBA practices." Defs.' Mem. at CM/ECF pp. 7–8. Those arguments have already been rejected in this Court's Order denying the NSBA's Motion to Dismiss. *See* Filing 37. As Mr. Lautenbaugh explained in his opposition to the NSBA's Motion to Dismiss, the purpose of filing this 42 U.S.C. § 1983 action was to challenge "violations of Plaintiff's federal constitutional rights" and obtain injunctive relief against the NSBA's collection of dues—relief that was unavailable in the state rule change proceeding. Filing 35 at CM/ECF p. 13.

on the misrepresentation of Defendant G. Michael Fenner that "The NSBA does not intend to seek Plaintiff's 2013 member dues currently held in Plaintiff's trust account and has explained to Plaintiff it does not intend to seek his member dues for 2013." Filing 66-1 at CM/ECF p. 2; Defs.' Mem. at CM/ECF pp. 7, 11–12, 20, 33, 36–37.

Mr. Fenner's statement is belied by the true facts and Mr. Fenner had no personal knowledge of the offers made by his attorneys to Mr. Lautenbaugh. Therefore, the NSBA's arguments based on Mr. Fenner's misstatement should be disregarded. In fact, when Mr. Lautenbaugh's attorney suggested the NSBA not seek the remaining $275.00 of Mr. Lautenbaugh's 2013 member dues following the Nebraska Supreme Court's ruling, the NSBA rejected that suggestion. Instead, the NSBA requested that Mr. Lautenbaugh remit his 2013 member dues in full or else be reported to the Nebraska Supreme Court for suspension of his license to practice law. Decl. of Gina Cannan at ¶ 7 (filed concurrently herewith as Exhibit 1 to Plaintiff's Supplemental Index of Evidence Re: Cross-Motions for Summary Judgment).[3]

On February 5, 2014, three business days before Mr. Lautenbaugh's motion for summary judgment was due, the NSBA made another offer. The NSBA suggested the parties obtain a court order requiring Mr. Lautenbaugh to pay his 2013 member dues in full, and then the NSBA would secretly return those dues to Mr. Lautenbaugh pursuant to a "confidential" settlement. Exhibit 1 at ¶¶ 10, 11; *cf. Hudson*, 475 U.S. at 305–06 ("A forced exaction followed by a rebate

---

[3] Because the NSBA has put its settlement offers to Mr. Lautenbaugh in dispute, those two offers are submitted herewith in their entirety. The NSBA's settlement offers are admissible to dispute the NSBA's mischaracterization thereof. *See Weems v. Tyson Foods, Inc.*, 665 F.3d 958, 966 (8th Cir. 2011) ("Evidence relating to a compromise offer is admissible if 'offered for "another purpose," *i.e.*, for a purpose other than to prove or disprove the validity of the claims that the offers were meant to settle.'") (quoting Fed. R. Evid. 408(b) and *Trebor Sportswear Co. v. The Limited Stores, Inc.*, 865 F.2d 506, 510 (2d Cir. 1989)); *Vulcan Hart Corp. v. N.L.R.B.*, 718 F.2d 269, 277 (8th Cir. 1983) ("Rule 408 excludes evidence of settlement offers only if such evidence is offered to prove liability for or invalidity of the claim under negotiation.").

equal to the amount improperly expended is . . . not a permissible response to the [dues-payers'] objections."). The purpose of this strange arrangement was ostensibly to save face for the NSBA, since the publicly available court order would show that Mr. Lautenbaugh was required to pay his 2013 member dues in full.

Regardless of the NSBA's motivations, Mr. Lautenbaugh naturally rejected both offers because the NSBA did not have constitutional procedures in place and operating in 2013. Thus, allowing the NSBA to collect dues it was not entitled to collect would defeat the purpose of this 42 U.S.C. § 1983 action. Although the amount is characterized as *de minimis* by the NSBA, Defs.' Mem. at CM/ECF p. 8, Mr. Lautenbaugh still seeks declaratory relief that he was not required to pay any portion of his 2013 member dues. *See Hudson*, 475 U.S. at 292 (emphasizing "the tyrannical character of forcing an individual to contribute even 'three pence' for the 'propagation of opinions which he disbelieves'") (quoting *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 234–35, n.31 (1977)). In the alternative, Mr. Lautenbaugh seeks declaratory relief as to any amount he *was* lawfully required to pay in 2013, in order to avoid any threat of suspension of his license to practice law. As the NSBA recognizes, declaratory relief is necessary to allow Mr. Lautenbaugh to withdraw the remaining $275.00 from his trust account. *See* Exhibit 1 at ¶ 7 ("I suspect we will need a further order from Judge Kopf allowing the transfer of the trust funds."). Therefore, the NSBA's settlement offers do not render this case moot.

### C. Because There Is Still A Live Case Or Controversy, The NSBA's Construction Of Straw Men Exceptions To The Mootness Doctrine Are Inapplicable Here.

It is unclear why the NSBA assumes that Mr. Lautenbaugh "[p]resumably" seeks to invoke an exception to the mootness doctrine. Defs.' Mem. at CM/ECF p. 24. Mr. Lautenbaugh

did not argue that the NSBA's actions in this case are "capable of repetition yet evading review." *Compare* Defs.' Mem. at CM/ECF p. 24 *with* Pl.'s Mem. at CM/ECF pp. 16–18. Nevertheless, the NSBA spends three pages of its brief deconstructing its own straw men. Defs.' Mem. at CM/ECF pp. 24–26.

To dispense with any confusion, Mr. Lautenbaugh affirmatively demonstrated that the withholding of his 2013 member dues in lieu of a preliminary injunction hearing presents a live controversy sufficient to provide Article III standing. *See* Pl.'s Mem. at CM/ECF pp. 16–18. Therefore, this Court should deny the NSBA's request for summary judgment on mootness grounds.

## II. THE NSBA'S PROCEDURES DID NOT COMPLY WITH *HUDSON*, AND THE NSBA DID NOT PROVIDE "ALTERNATIVE PROCEDURES" SUFFICIENT TO MEET *HUDSON*'S MINIMUM THRESHOLD.

The NSBA argues that, although its practices and procedures in place in 2013 did not comply with *Hudson* and *Keller*, it provided "alternative procedures" that were "adequate" to protect the constitutional rights of its members. Defs.' Mem. at CM/ECF pp. 35–36. Because the NSBA's procedures did not meet even the "*minimum* set of procedures" outlined by *Hudson* necessary to protect its members' constitutional rights, *Davenport v. Washington Educ. Ass'n*, 551 U.S. 177, 185 (2007) (emphasis in original), this Court should grant summary judgment in Mr. Lautenbaugh's favor on this issue.

### A. The NSBA Failed To Provide Disclosures Sufficient For NSBA Members To Determine Whether Or Not To Object To The NSBA's Chargeability Determinations.

The NSBA does not attempt to argue that the 2013 member dues statement provided disclosures sufficient for NSBA members to decide whether or not to object to the NSBA's expenditures. Instead, the NSBA argues that the balance of its publications throughout 2013

were sufficient to provide NSBA members with enough information to determine whether to object to the NSBA's expenditures. Defs.' Mem. at CM/ECF pp. 41–42. Although *Hudson* may not require the NSBA to provide its members with "an exhaustive and detailed list of all its expenditures," 475 U.S. at 307 n.18, the NSBA does not explain why this exempts the NSBA from providing members with *any* breakdown of its expenditures on chargeable and non-chargeable activities before collecting mandatory dues. Defs.' Mem. at CM/ECF p. 41.

Instead, the NSBA's position is that its "Legislative Updates" and "Legislative Summaries" disclose to NSBA members the bills which the NSBA takes a position on, and thus, NSBA members have enough information regarding the NSBA's lobbying activities to object. Defs.' Mem. at CM/ECF p. 42. The NSBA also relies on the availability of a "Statement of Activities" and its annual budget upon request.[4] *Id.*

At a minimum, *Hudson* requires disclosure of the "major categories of expenses" to dues-payers, as well as "the basis for the proportionate share" of chargeable activities. 475 U.S. at 306, 307 n.18. Both the "Legislative Updates" and the "Legislative Summaries" merely relay the NSBA's lobbying positions on legislation. *See* Filing 63-1 at CM/ECF pp. 213–85, 395–97. They do not disclose the amounts expended on such lobbying, nor provide a delineation between those lobbying activities considered chargeable and those considered non-chargeable. *Laramie v. County of Santa Clara*, 784 F. Supp. 1492, 1494 (N.D. Cal. 1992) ("The union must provide

---

[4] In an attempt to rectify the shortcomings of its disclosures, the NSBA argues that its Legislative Check-Off procedure segregated dues from "*all* lobbying activities" into a separate NSBA account. Defs.' Mem. at CM/ECF pp. 37–38 (emphasis in original). As explained more fully *infra*, the Legislative Check-Off applied to only a very small portion of dues and did *not* apply to "*all*" lobbying activities." Further, even if selecting the Legislative Check-Off did result in the segregation of that portion of member dues slated for non-chargeable activities, and segregation was a constitutionally sufficient option under *Hudson*, adequate disclosure of the basis of that member's "proportionate share" of *chargeable* activities is still required. *Hudson*, 475 U.S. at 306.

[dues-payers] with an audited financial statement that identifies the major categories of expenses, and divide[] them into chargeable and non[-]chargeable expenses."). Similarly, the NSBA's "Statement of Activities" does not provide major categories of expenses—indeed, it does not itemize expenditures at all—much less separate them into chargeable and non-chargeable activities. Plaintiff's Statement of Undisputed Facts ("PSOF"), Filing 62-1 at ¶ 65. The NSBA's 2013 budget was available only upon request, which is insufficient under *Hudson*. *Damiano v. Matish*, 830 F.2d 1363, 1370 (6th Cir. 1987) (union must provide the disclosures "without formal request and within a reasonable period of time"). Additionally, the 2013 budget fails to separate NSBA expenditures into chargeable and non-chargeable categories. Filing 63-1 at CM/ECF pp. 314–32. The NSBA does not address these shortcomings.

There was simply no way for a NSBA member to determine the "propriety" of "the basis for the proportionate share" of chargeable activities in 2013 without being properly informed about: (1) the amount of the proportionate share; (2) what activities were considered chargeable and thus fell within that "proportionate share[;]" and (3) what activities were considered non-chargeable and thus fell outside that member's "proportionate share." *See Hudson*, 475 U.S. at 306; *see also Hohe v. Casey*, 956 F.2d 399, 410 (3d Cir. 1992) ("[T]he issue is whether the notice provided nonmembers with information sufficient to gauge the *propriety* of the fee, and thus whether the notice provided nonmembers with sufficient information to determine whether they were only being compelled to contribute to chargeable activities.") (emphasis in original). The NSBA's silence regarding its non-disclosure of a member's proportionate share of chargeable activities—much less its non-disclosure of which activities it treated as chargeable— is deafening. *Compare* Defs.' Mem. at CM/ECF pp. 41–42 *with* Pl.'s Mem. at CM/ECF pp. 21–22.

The NSBA required member dues to be paid by January 1, 2013. Filing 62-1 at CM/ECF p. 13. In arguing that disclosures made throughout 2013 satisfy *Hudson*, the NSBA ignores its members' fundamental right "to be informed *before* making a choice whether to pay for non-chargeable expenditures." *Wagner v. Professional Engineers in California Gov't*, 354 F.3d 1036, 1043 (9th Cir. 2004) (emphasis in original). Disclosures must be provided at or before the time mandatory dues are collected, although they may permissibly be based on expenditures from the prior year.[5] *Hudson*, 475 U.S. at 307 n.18; *Tierney v. City of Toledo*, 824 F.2d 1497, 1506 (6th Cir. 1987) ("*Tierney I*") (Finding a union's procedures unconstitutional because they did not comply with "*Hudson*'s requirement that detailed financial information concerning all major categories of union expenses, . . . [be] provided to all non-members *before any fees may be collected from them*.") (emphasis added). Tellingly, another federal district court has rejected an argument remarkably similar to that of the NSBA. In *Popejoy v. New Mexico Bd. of Bar Com'rs*, 831 F. Supp. 814, 818 (D.N.M. 1993), *amended on reconsideration in part*, 867 F. Supp. 1422 (D.N.M. 1995), the bar association argued that its end-of-year financial statement, budget, and articles published throughout the year regarding the activities of committees and task forces satisfied *Hudson*'s disclosure requirement. The court rejected the bar association's argument, explaining that after-the-fact disclosures were insufficient because "the timing of the dues collection is essential." *Id.* at 819–20.

---

[5] The inadequacy of the NSBA's disclosures is highlighted by the fact that it would be unduly burdensome for a NSBA member paying dues in 2013 to wade through all the documents published by the NSBA in 2012—especially if that member was not a dues-paying NSBA member in 2012. The burden is on the NSBA to provide members with "an adequate accounting" before collecting dues. *Tierney I*, 824 F.2d at 1504; *Lehnert v. Ferris Faculty Ass'n*, 500 U.S. 507, 524 (1991) ("[A]s always, the union bears the burden of proving the proportion of chargeable expenses to total expenses.").

The NSBA is also wrong in arguing that disclosures made "upon request" satisfy *Hudson*. Defs.' Mem. at CM/ECF p. 42.  A dues-payer should not be required to "request" constitutionally mandated disclosures.  *Cummings v. Connell*, 177 F. Supp. 2d 1060, 1067 (E.D. Cal. 2001) *aff'd in relevant part*, 316 F.3d 886 (9th Cir. 2003) ("Offering to send an audit upon request does not allow plaintiffs to 'gauge the propriety of the union's fee,' . . . nor does it tell the fee payers that the union actually spent the money the way that it claimed") (quoting *Hudson*, 475 U.S. at 306); *Hohe*, 956 F.2d at 411 (disclosures that "placed [dues-payers] in the position of having to object to obtain the information needed to gauge the propriety of the fee" were inadequate); *Popejoy*, 831 F. Supp. at 820 (the fact that "members must object in order to receive adequate disclosure" highlighted "the unconstitutionality of the Bar's disclosures.").

Finally, although the NSBA asserts that its budget is "verified by an independent auditor," Defs.' Mem. at CM/ECF p. 42, the requirement for review by an independent auditor is pointless if the auditor has nothing to verify.  *Dashiell v. Montgomery County*, 925 F.2d 750, 756 (4th Cir. 1991) (the purpose of the auditor requirement is to "determine whether the amounts claimed by the union for chargeable activities are true"); *Foster v. Mahdesian*, 268 F.3d 689, 692 n.7 (9th Cir. 2001) ("[T]he financial statements accompanying the notice must be audited (not merely reviewed) in order to *assure* that the union has actually spent the amounts of money claimed to have spent on the chargeable activities.") (emphasis in original) (internal quotations and citations omitted); PSOF ¶ 59 (NSBA admitting that it "does not identify any portion or category of its financial information as 'chargeable' or 'non-chargeable'" in the information it provides to its auditors).  The inadequacy of the NSBA's disclosures is highlighted by the fact that it would be impossible for an auditor to look at the cited disclosures and verify that the NSBA had actually spent the amounts of money it claimed to have spent on its chargeable

activities. *See Popejoy*, 831 F. Supp. at 820 ("[A]lthough Defendants present to the Bar members an annual proposed budget and an annual report, the latter of which is audited by an independent auditor, it does not categorize its expenses into chargeable and nonchargeable expenses. As this categorization is nonexistent, an independent auditor cannot verify chargeable and nonchargeable expenditures.").

The documents disseminated by the NSBA to its members in 2013 do not even come close to resembling the "audited financial statement that identifies the major categories of expenses, and divides them into chargeable and non[-]chargeable expenses" that courts have deemed sufficient to satisfy the minimum *Hudson* requirements. *Laramie*, 784 F. Supp. at 1494; *Hudson*, 475 U.S. at 307 n.18. Thus, the disclosures provided to NSBA dues-payers in 2013 were unconstitutional as a matter of law.

### B.     The NSBA Failed To Provide An Impartial Grievance Procedure To NSBA Members.

In trying to defend its Grievance Procedure, the NSBA concedes that its own Executive Council makes the "final determination" regarding a NSBA member's grievance. *Compare* Defs.' Mem. at CM/ECF pp. 39–40 *with* Pl.'s Mem. at CM/ECF pp. 29–30; PSOF ¶ 82. This concession is fatal to the NSBA's attempted defense of its Grievance Procedure. *Hudson*, 475 U.S. at 307 (a constitutionally adequate grievance procedure provides a "reasonably prompt decision by an *impartial* decisionmaker") (emphasis added).

Notwithstanding this fatal flaw, the NSBA attempts to save its Grievance Procedure by arguing that the first step of the Grievance Procedure is review by a committee "comprised of three NSBA members who were *not* association officers or members of the House of Delegates, Executive Council, or Legislation Committee." Defs.' Mem. at CM/ECF p. 40. As previously demonstrated, a grievance procedure cannot be controlled by an "interested party," thus the

partial involvement of a neutral committee is irrelevant. *Hudson*, 475 U.S. at 308 (where two out of the three grievance procedure steps involved union officials, the procedure was inadequate); Pl.'s Mem. at CM/ECF pp. 29–30. The fact that the NSBA's own Executive Council makes the "final determination" regarding a grievance ends the necessary inquiry. Furthermore, the three NSBA members that make up the Grievance Committee are hand-picked by the current NSBA president. PSOF ¶ 81. Thus, it is unlikely that even the first level of review involves an "impartial decisionmaker." *Hudson*, 475 U.S. at 307.

The NSBA does not address *Hudson's* requirement of both adequate notice *and* a grievance procedure. The NSBA's procedures are constitutionally inadequate in part because NSBA members are barred from using both the Legislative Check-Off and the Grievance Procedure. *Compare* Pl.'s Mem. at CM/ECF p. 29 *with* Defs.' Mem. at CM/ECF pp. 39–40. Ironically, the NSBA argues that "[t]he Legislative Check-Off and Dues Grievances [sic] procedures, taken together, properly ensured that objecting member's mandatory dues are not spent on non-chargeable lobbying activities[.]" Defs.' Mem. at CM/ECF p. 40. Even if it were constitutionally permissible to bar dues-payers from filing a grievance if they opted out of funding a portion of expenditures, the Legislative Check-Off and Grievance Procedure cannot be "taken together" when NSBA members must choose one or the other.

Finally, the NSBA continues to claim, without any legal basis, that Mr. Lautenbaugh does not have standing to challenge the Grievance Procedure because he was barred, by the terms of the Grievance Procedure, from utilizing both the Legislative Check-Off and the Grievance Procedure. Defs.' Mem. at CM/ECF p. 40 n.7. The NSBA does not address the cases cited by Mr. Lautenbaugh that directly address standing, Pl.'s Mem. at CM/ECF p. 29 n.15, and

incorporates no legal arguments into its bald assertion that Mr. Lautenbaugh lacks standing. Defs.' Mem. at CM/ECF p. 40 n.7.

In the absence of statutorily imposed exhaustion requirements, exhaustion is not required for suits brought under 42 U.S.C. § 1983. *Porter v. Nussle*, 534 U.S. 516, 523 (2002). The NSBA is not an agency with statutorily imposed exhaustion requirements and it cites no statutory authority for its proposition that exhaustion is required. Defs.' Mem. at CM/ECF p. 40 n.7. Indeed, courts have affirmatively held that a dues-payer is not required to utilize an unconstitutional procedure before challenging the constitutionality of that procedure. *Lowary v. Lexington Local Bd. of Educ.*, 903 F.2d 422, 430 (6th Cir. 1990) ("Availing themselves of the objection procedure is unimportant if the procedure violates their constitutional rights.") (internal quotations omitted); *Hudson v. Chicago Teachers Union*, 743 F.2d 1187, 1194 (7th Cir. 1984), *aff'd*, 475 U.S. 292 (1986) ("None of the plaintiffs followed the prescribed procedure through to the end (some did not invoke it at all), but that is unimportant if the procedure violates their constitutional rights."). Because the Grievance Procedure in place and operating in 2013 was controlled by an interested party and barred NSBA members who selected the Legislative Check-Off from filing a grievance, Mr. Lautenbaugh has standing to challenge the procedure and it was unconstitutional as a matter of law.

### C. The NSBA Was Required To Provide A Rebate Or Refund Of The Portion Of Mandatory Member Dues Slated For Non-Chargeable Activities.

It is black-letter law that a mandatory association must provide a rebate or advance reduction of mandatory member dues considered to be non-chargeable. *Ellis v. Railway Clerks*, 466 U.S. 435, 444 (1985) (constitutionally permissible options include advance reduction of the portion of dues the union "was not allowed to exact in the first place" and/or a refund plus interest); *Tavernor v. Illinois Federation of Teachers*, 226 F.3d 842, 847 (7th Cir. 2000)

(constitutional procedures for collecting member dues avoid requiring dues-payers "to make an involuntary (even if temporary) loan to the union").  It is well-established that even a temporary withholding of non-chargeable dues from dissenting dues-payers is unconstitutional.  *Tierney I*, 824 F.2d at 1504–05 (a collection procedure where the union collected a fee equal to 100 percent of union dues and refunded the non-chargeable amount upon objection was unconstitutional); *Knox v. Service Employees Intern. Union*, 132 S. Ct. 2277, 2292–93 (2012) ("[E]ven a full refund would not undo the violation of First Amendment rights . . . the First Amendment does not permit a union to extract a loan from unwilling nonmembers even if the money is later paid back in full.").  The NSBA is tellingly silent regarding this issue.

The NSBA ignores the fact that constitutional precedent prevents compelling Mr. Lautenbaugh to pay more than his "proportionate share" of chargeable expenses for 2013.  *Hudson*, 475 U.S. at 306–07; *compare* Defs.' Mem. at CM/ECF p. 39 *with* Pl.'s Mem. at CM/ECF pp. 30–32.  Instead, the NSBA makes the half-hearted argument that it was not required to reimburse that portion of NSBA member dues slated for non-chargeable activities because it placed those dues in a "reserve fund"[6] that, according to the NSBA, could not be used for "legislative advocacy."  Defs.' Mem. at CM/ECF p. 39.

The NSBA's argument does not address that an association may not charge dues-payers more than their *pro rata* share for chargeable activities.  *Lehnert*, 500 U.S. at 524 (a mandatory association may charge dues-payers for their "*pro rata* share" of the association's chargeable activities); *Foster*, 268 F.3d at 692 (dues-payers "are not required to pay fees in excess of those properly chargeable.").  It is irrelevant that the NSBA "completely segregated" Legislative

---

[6] The alleged existence of a separate "reserve fund" is immaterial.  *Knox*, 132 S. Ct. at 2293 (" a union's money is fungible, so even if the new fee were spent entirely for nonpolitical activities, it would free up other funds to be spent for political purposes").

Check-Off dues from its general fund in 2013 and that the reserve fund "was not accessed by the NSBA during the period from 2010-2012." *See* Defs.' Mem. at CM/ECF p. 39. Even if the NSBA had spent those funds on completely chargeable activities, it still would have been acting outside its constitutional authority. Funds slated for non-chargeable activities were not the NSBA's to allocate, and they were not the NSBA's to keep in a reserve fund. *Wessel v. City of Albuquerque*, 327 F. Supp. 2d 1332, 1340 (D.N.M. 2004) *aff'd in relevant part*, 463 F.3d 1138 (10th Cir. 2006) ("Earmarking the fees for a chargeable purpose does not purge their unconstitutional taint when the fees are collected to finance non-chargeable activities.").

Moreover, the amount of mandatory dues redirected to the "reserve fund" when a NSBA member selected the Legislative Check-Off was very small. As previously demonstrated and as demonstrated herein, the NSBA treated only $30,000 of the $1,830,817 NSBA member dues collected in 2013 as non-chargeable. PSOF ¶ 60; Filing 63-1 at CM/ECF p. 325. Mr. Lautenbaugh challenges not only the lack of a refund or rebate procedure, but the amount treated as non-chargeable as well. *See* Pl.'s Mem. at CM/ECF pp. 36–37, 39–47. It is the NSBA's burden to show the chargeability of the remaining $1,800,817 in member dues collected. *Lehnert*, 500 U.S. at 524.

There is no authority authorizing the NSBA to retain 100 percent of a NSBA member's dues regardless of what percentage of those dues was slated for non-chargeable activities in 2013. The NSBA's complete failure to provide a refund or rebate procedure is unconstitutional as a matter of law. *Ellis*, 466 U.S. at 444 (constitutionally permissible options include advance reduction of the portion of dues the union "was not allowed to exact in the first place" and/or a refund plus interest). Therefore, Mr. Lautenbaugh is entitled to summary judgment that the

NSBA's method and procedures for collecting mandatory member dues in 2013 were unconstitutional as a matter of law. Accordingly, Defendants are liable under 42 U.S.C. § 1983.

## III.  THE NSBA WAS NOT ENTITLED TO COLLECT MANDATORY DUES IN THE ABSENCE OF CONSTITUTIONALLY ADEQUATE PROCEDURES.

It is well established that, in the absence of constitutionally adequate procedures, a mandatory association is not entitled to collect dues. *Hohe*, 956 F.2d at 496. In exchange for the "extraordinary benefit of being empowered to compel [dues-payers] to pay for services that they may not want and in any event have not agreed to fund," *Knox*, 132 S. Ct. at 2295, a "plan with procedures meeting the commands of *Abood* and *Hudson* [must be] established and operating." *Tierney I*, 824 F.2d at 1504. The NSBA ignores this crystal-clear precedent and continues to assert its "alternative procedures" entitled it to collect mandatory member dues in 2013. *Compare* Defs.' Mem. at CM/ECF pp. 36–37 *with* Pl.'s Mem. at CM/ECF pp. 16, 18–20.

The self-evident justification for preventing a mandatory association from collecting even chargeable dues without constitutional procedures in place and operating is that it must disclose the basis for its fee calculation. *Hudson*, 475 U.S. at 307 (union must make "an adequate disclosure of the reasons why they were required to pay their share of 95% [of dues]"); *see Swanson v. Univ. of Hawaii Professional Assembly*, 269 F. Supp. 2d 1252, 1258 (D. Haw. 2003) (where the union's disclosure failed to "identify the chargeable expenses[,] [s]uch a failure renders the disclosure inadequate under *Hudson*.") (internal citations omitted). There is simply no way to read *Hudson* that does not lead to the conclusion that a mandatory association "must have a constitutional procedure in place *before* deducting fees." *Hohe*, 956 F.2d at 406 (emphasis in original). Because the NSBA did not have constitutional procedures in place and operating before it sought to collect mandatory dues in 2013, it was not entitled to collect any portion of Mr. Lautenbaugh's 2013 dues, and Mr. Lautenbaugh is entitled to summary judgment.

## IV. THE EFFECT OF THE NSBA'S PRACTICES AND PROCEDURES IN 2013 WAS THAT MANDATORY MEMBER DUES WERE EXPENDED ON NON-CHARGEABLE ACTIVITIES.

The NSBA's extensive non-chargeable activities are so indefensible that the NSBA attempts to justify its unconstitutional actions by hiding behind its compliance with the Nebraska Supreme Court rules authorizing and governing its associational activities. Defs.' Mem. at CM/ECF pp. 9–10, 29–30. It also argues, extensively, that it complied with its own Legislative Program and Policy Statement.[7] Defs.' Mem. at CM/ECF pp. 9–14, 30–34. First, federal constitutional law imposes strictures on the NSBA's actions above and beyond those strictures placed on it by the Nebraska Supreme Court.[8] Second, Neb. S. Ct. R. § 3-802(A) does not justify the extensive non-chargeable activities undertaken by the NSBA. *Compare* Defendants' Statement of Undisputed Facts (Filing 67) at ¶ 4 *with* PSOF at ¶¶ 17, 21, 25, 30–41. The NSBA's reliance on its purposes listed in Neb. S. Ct. R. § 3-802(A) and its internal policies misses the mark. It is the results of the NSBA's practices and policies that are relevant in determining whether those practices and polices adequately protected NSBA members' rights in 2013. *Gibson v. The Florida Bar*, 798 F.2d 1564, 1569 (11th Cir. 1986) ("In an action such as this, where specific actions are challenged as contrary to the [F]irst [A]mendment, it is not sufficient to assess the rules and procedures by which those actions were taken. The proper focus in this action should be upon the actual results of the Bar's Legislative Program . . ."). The

---

[7] Contrary to the NSBA's contention, Mr. Lautenbaugh does not dispute the existence of the NSBA's "funnel system" outlined in the Legislative Program and Policy Statement. *See* Defs.' Mem. at CM/ECF p. 33. Mr. Lautenbaugh merely states that it was inadequate to protect NSBA members' constitutional rights, as demonstrated by the breadth of the NSBA's legislative agenda. Pl.'s Mem. at CM/ECF p. 48. Additionally, Mr. Lautenbaugh demonstrated that all activities in support of non-chargeable legislation—including research and analysis of non-chargeable legislation—are themselves non-chargeable. Pl.'s Mem. at CM/ECF pp. 40–47.

[8] The NSBA ignores that, whatever the "general principles outlined in [Neb. Ct. R.] § 3-802(A)," the NSBA is still subject to the United States Constitution. Therefore, even if an activity is *permissible* under Rule § 3-802(A), it may not be *chargeable* under *Keller*.

actual result of the NSBA's legislative program in 2013 was that mandatory member dues were used to fund non-chargeable activities.

### A. The NSBA's Definition Of Activities That May Permissibly Be Funded By Dissenting Members' Dues Is Impermissibly Narrow.

The NSBA concedes that less than 2 percent of NSBA member dues were considered applicable to "lobbying purposes" in 2013 and, thus, subject to the Legislative Check-Off. *Compare* PSOF ¶¶ 47–50 *with* Filing 67 at CM/ECF p. 6. The NSBA explains that this 2 percent amount is calculated by the lobbyist's determination that it spends one-third of its time on "legislative advocacy," and that is the sum total of its non-chargeable activities.[9] Defs.' Mem. at CM/ECF p. 11. Because the total amount of the lobbyist's contract in 2013 was $90,000, one-third of the amount of the lobbyist's contract was considered non-chargeable in 2013. PSOF ¶ 60; Filing 67 at CM/ECF p. 7. Thus, the practical effect of the NSBA's practices and procedures in 2013 was that $30,000 of the $1,830,817 NSBA member dues collected—about 1.6 percent— was treated as non-chargeable.[10] Filing 63-1 at CM/ECF p. 325. In the Legislative Check-Off procedure on the 2013 member dues statement, this amount was characterized as the amount slated for "lobbying purposes." PSOF ¶ 44. As explained by Jane Schoenike, NSBA's executive director of 16 years, "lobbying purposes" is defined narrowly as direct contact between

---

[9] The NSBA repeatedly emphasizes that some lobbying activity is chargeable, since some legislation may advance the regulation of the legal profession or improve the quality of legal services. Defs.' Mem. at CM/ECF pp. 27–37; *Keller*, 496 U.S. at 13. Mr. Lautenbaugh has never disputed this proposition. Instead, he argues that the NSBA's non-chargeable lobbying, expenditures in support of that non-chargeable lobbying, and other non-chargeable activities conducted by the NSBA should not be funded by the mandatory dues of dissenting NSBA members. *Compare* Defs.' Mem. at CM/ECF p. 39 *with* Pl.'s Mem. at CM/ECF pp. 42–47.

[10] In 2012, the most recent year disclosed by Defendants, the actual reduction to the amount paid Mueller Robak was $2,391.14. Ledger of Payments from NSBA to Mueller Robak, LLC (filed concurrently herewith as Exhibit 5 to Plaintiff's Supplemental Index of Evidence Re: Cross-Motions for Summary Judgment). In 2012, the amount of Mueller Robak's contract was $85,000. *Id.*

the NSBA's lobbyist and a legislator.  PSOF ¶ 53.  The NSBA concedes that at least some of its legislative advocacy was non-chargeable.  Defs.' Mem. at CM/ECF pp. 31–33.

It is a very narrow category of activities that may be permissibly funded by compelled payment of dues.  *Acevedo-Delgado v. Rivera*, 292 F.3d 37, 41 (1st Cir. 2002) (recognizing that only coerced association related to the state's demonstrated needs may be funded by mandatory dues).  The rationale for limiting collection of compelled dues to expenditures germane to the purposes of the association is simple:  "Compelling financial support for activities wholly unrelated to those public interests [of regulating the legal profession and improving the quality of legal services] . . . changes the balance and weakens the justification that supported the intrusion on First Amendment associational interests in the first place."  *Romero v. Colegio de Abogados de Puerto Rico*, 204 F.3d 291, 301 (1st Cir. 2000).  Furthermore, all overhead or administrative costs expended in support of non-chargeable activities are themselves non-chargeable.  *Bromley v. Michigan Educ. Ass'n-NEA*, 82 F.3d 686, 696 (6th Cir. 1996) (categories of administrative costs that were treated as chargeable instead should have been allocated proportionally between chargeable and non-chargeable activities); *Ellis*, 466 U.S. at 451 ("If the union cannot spend dissenters' funds for a particular activity, it has no justification for spending their funds writing about that activity."); *Foster*, 268 F.3d at 692 n.6 (non-chargeable fees include those that "support or advance" an association's non-chargeable activities).  The NSBA does not attempt to rebut these legal authorities and merely reiterates its narrow definition of chargeability.  Defs.' Mem. at CM/ECF pp. 30–34.  Such a blasé approach to protecting the constitutional rights of its members contradicts the "careful distinctions" mandated by *Hudson*, 475 U.S. at 306, and fails entirely to meet the NSBA's burden of showing chargeability.  *Lehnert*, 500 U.S. at 524.

## B. The NSBA Offers An Inadequate Basis For The Chargeability Of Some Of Its Activities, And Completely Ignores The Chargeability Of Other Activities.

Mr. Lautenbaugh submits the NSBA following activities were not germane to its compelling interests in regulating the legal profession and improving the quality of legal services, *Keller*, 496 U.S. at 13, and thus were not chargeable to dissenting members: (1) Staff time spent on non-chargeable lobbying and administrative activities in support of that lobbying;[11] (2) time spent by Mueller Robak lobbying on non-chargeable legislation; (3) time spent by Mueller Robak assisting the NSBA in taking a position on non-chargeable legislation, including time spent attending meetings and time spent monitoring, reviewing, and researching legislation; (4) time spent by Mueller Robak expressing the NSBA's positions on non-chargeable legislation to the Nebraska state legislature, NSBA members, the media, and/or the public; (5) expenditures for overhead, expenses, and reimbursement of costs for non-chargeable portions of meetings; (6) dining, travel and entertainment for NSBA officers, staff, and lobbyists, including the "Summer Planning Conference" in Lake Tahoe, California; the annual trip to Washington, D.C.; and the annual "past presidents dinner"; (7) expenditures for the non-chargeable portions of the Annual Meeting; (8) expenditures on a "legislative reception" for members of the Nebraska State Legislature; (9) expenditures on publishing those portions of *The Nebraska Lawyer* relating to non-chargeable subject matters; and (10) expenditures on the non-chargeable portions of NSBA programs, committees, studies, and/or sections. Pl.'s Mem. at CM/ECF pp. 39–44, 46–47; PSOF

---

[11] The NSBA's characterization of all activities conducted by NSBA staff as "administrative," Defs.' Mem. at CM/ECF p. 11, is belied by the breadth of work NSBA staff does in implementing the Legislative Program. PSOF ¶ 21. Additionally, NSBA's characterization of testimony before the Nebraska legislature as solely conducted by "volunteers," Defs.' Mem. at CM/ECF p. 11, ignores the substantial research, communications, negotiations, and drafting conducted by paid NSBA staff in preparation for such testimony. PSOF ¶ 21.

¶¶ 21, 25, 29–40.  The NSBA inadequately addresses some of these allegations, and ignores the rest.

### i. The Social Activities Conducted By The NSBA Were Neither *De Minimis* Nor Chargeable.

The NSBA's argument that it may use mandatory dues for social activities and conferences does not fully address Mr. Lautenbaugh's list of allegedly non-chargeable social activities; nor is it convincing regarding the activities it *does* address.  Significantly, it completely ignores categories of expenditures such as golf, alcohol, travel, a "reception" for state politicians, and non-chargeable portions of the Annual Meeting.  PSOF ¶¶ 30–40.

The NSBA asserts that it conducted "limited social activities" in 2013.  Defs.' Mem. at CM/ECF p. 34.  As previously demonstrated, courts have allowed the funding of "*de minimis* social activities" with mandatory member dues, at least in the union context.  Pl.'s Mem. at CM/ECF pp. 34–35.  In *Ellis*, *de minimis* social activities included "purchasing refreshments for union business meetings" that were "formally open to nonmember employees."  466 U.S. at 449.  The purchase of "refreshments" made up 0.7 percent of the union's expenditures.  *Id.*  These "minor incidental expenditures" are unlike the $38,000 planning conference held by the NSBA for its executive staff and officers in Lake Tahoe or the $3,000 past president's dinner held by the NSBA for its executive staff and officers at an exclusive country club.  PSOF ¶ 40.  As the First Circuit explained in distinguishing *Ellis*'s social activities, "[t]hat those expenditures were chargeable is not an argument for permitting compelled contributions to *significant* and non-germane expenditures."  *Romero*, 204 F.3d at 300 (emphasis added).  Moreover, the NSBA fails to explain how even *de minimis* social activities that are chargeable in a union context are similarly chargeable in a bar association context.  *See Ellis*, 466 U.S. at 449–50 (justifying *de minimis* social expenditures as a standard feature of union meetings "that are formally open to

nonmember employees"). Here, the majority of social activities alleged to be chargeable by the NSBA were not "formally open" to NSBA members. *See* Schoenike Dep. 73:18–24 (Filing 63-1 at CM/ECF p. 101).

### ii. The Publications Of The NSBA Were Not Chargeable Merely Because They Informed NSBA Members Regarding Legislation.

Similarly, the NSBA's justification for the chargeability of its publications glosses over the requirement to differentiate between the portions of a publication that are chargeable and the portions of a publication that are non-chargeable. *Compare* Defs.' Mem. at CM/ECF p. 35 ("publications are important to the purposes of the NSBA, including keeping its members apprised of its own activities") *with Ellis*, 466 U.S. at 451 ("If the union cannot spend dissenters' funds for a particular activity, it has no justification for spending their funds writing about that activity.") *and Lehnert*, 500 U.S. at 528 (union publications reporting on the teaching profession generally, but unconnected to the collective bargaining function of the union, were non-chargeable). Mr. Lautenbaugh does not contend the NSBA is barred from reporting to NSBA members regarding its chargeable activities. However, he submits that publications (whether e-mails or editorials in *The Nebraska Lawyer*) conveying the NSBA's positions on non-chargeable legislation, defending the NSBA's positions on non-chargeable legislation, or informing NSBA members regarding legislation generally fall outside the NSBA's purposes of regulating the legal profession or improving the quality of legal services. Pl.'s Mem. at CM/ECF pp. 41–42, 41 n.24; *see, e.g.,* Filing 63-1 at CM/ECF pp. 213–285, 395–397, 414–15. The NSBA simply makes no attempt to differentiate between informing NSBA members about, for example, a bill that would change court filing fees, which is arguably chargeable; and a bill that would impose racial profiling requirements on law enforcement officers, which is not chargeable. *See* Filing 63-1 at CM/ECF pp. 217, 264.

### iii. The NSBA's Attempt To Gloss Over The Remainder Of Its Non-Chargeable Activities By Characterizing Them As Non-Expressive Has No Basis In The Law.

As an apparent justification for its position that all its activities besides direct lobbying are chargeable, the NSBA classifies all activities that are not lobbying as not "expressive" and thus chargeable. Defs.' Mem. at CM/ECF pp. 32–33. For example, the NSBA asserts, without authority or discussion, that the NSBA staff's review, consideration, and communications regarding pending legislation were chargeable, as were its lobbyist's analysis, research, and communications regarding pending legislation. Defs.' Mem. at CM/ECF p. 34. The NSBA makes no effort to address the cases cited by Mr. Lautenbaugh or *Keller*'s core holding that all chargeable activities must be related to regulating the legal profession or improving the quality of legal services. 496 U.S. at 14. Instead, the NSBA submits that those activities—and presumably all others alleged to be non-chargeable and not addressed by the NSBA—were not "expressive" and thus chargeable.

There is no basis for the NSBA's argument. In support of its novel distinction, the NSBA cites *Bd. of Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 234–35 (2000), which held that a public university could charge its students an "activity fee" used to fund a program to facilitate extracurricular student speech.

*Bd. of Regents* is distinguishable on several grounds. First, and most importantly, although *Bd. of Regents* discussed *Abood* and *Keller*, it expressly rejected the plaintiffs' contention that public universities should be subject to the same compelled speech restrictions as unions and bar associations. *Id.* at 230–32 (declining to impose a germaneness analysis on the university). Second, the subsidized speech at issue in *Bd. of Regents* was viewpoint neutral, a fact the Court found determinative in allowing mandatory student fees to fund the program. *Id.*

at 233 ("Viewpoint neutrality is the justification for requiring the student to pay the fee in the first instance and for ensuring the integrity of the program's operation once the funds have been collected."). There is no similar contention of viewpoint neutrality here, and even if there was, the NSBA is undisputedly subject to the First Amendment under *Keller*.

The NSBA cites no case wherein a union or bar association was allowed to fund non-chargeable activities merely because they were not "expressive." To the contrary, courts have recognized that activities not strictly characterized as "speech" are still subject to a germaneness analysis in the bar association or union context. *See Romero*, 204 F.3d at 293, 300 (rejecting the bar association's contention that the germaneness test applies only to ideological or political speech and holding that the bar association could not use dissenting members' dues to pay for life insurance for those members); *Ellis*, 466 U.S. at 449–52 (considering whether a union's conventions, social activities, publications, and organizing activities were germane without differentiating between speech and non-speech activities); *Seidemann v. Bowen*, 584 F.3d 104, 116–17 (2d Cir. 2009) ("*Seidemann II*") ("A local union's charges for the salaries of union employees are not exempt from the general rule that a union seeking to charge a dissenter for a *pro rata* share of its expenses bears the burden of establishing their chargeability and the proportion of chargeable expenses to overall expenditures."). Thus, Mr. Lautenbaugh is entitled to summary judgment regarding the non-chargeability of the remaining alleged activities.

    **C.    The NSBA's Legislative Check-Off Reserve Did Not Prevent Dissenting Members' Dues From Being Spent On Non-Chargeable Activities In 2013.**

The NSBA makes much of its allegation that "the legislative check off reserve is never used to fund *any* legislative activities." Defs.' Mem. at CM/ECF p. 15 (emphasis in original). This allegation completely sidesteps the fact that only a very small amount of NSBA member dues is placed in the "legislative check off reserve" when a NSBA member selects the

Legislative Check-Off. Only $30,000 of the $1,830,817 of mandatory member dues collected in 2013 was treated as non-chargeable. Filing 63-1 at CM/ECF p. 325. The remainder of a dissenting member's dues were used to fund a myriad of non-chargeable activities, including the non-chargeable activities of NSBA staff; overhead for the non-chargeable activities of committees and sections; social events; conferences; publications; the lobbyist's monitoring, research, review, and communications regarding non-chargeable legislation; and significant expenses relating to the non-chargeable portions of the NSBA's legislative agenda. PSOF ¶¶ 21, 25, 28–40. The actual effect of the NSBA's practices and procedures in place in 2013, including the NSBA's "check off reserve", was that mandatory member dues were slated and used for non-chargeable activities. *See* Pl.'s Mem. at CM/ECF pp. 39–47.

Because a portion of mandatory member dues was slated for non-chargeable activities in 2013, if Mr. Lautenbaugh is required to pay any portion of his 2013 dues, the "share" of his dues that is properly chargeable must be determined. *See Hudson*, 475 U.S. at 307 (explaining that a union must justify the amount of a dues-payer's proportionate share of chargeable expenses before collecting dues). As explained *supra*, the check off reserve itself is unconstitutional because it forced NSBA members to pay more than their proportionate share of chargeable expenses in 2013. Therefore, it cannot be used as a justification for the NSBA's failure to conduct a chargeability analysis.

### D. NSBA Members' Freedom To Engage In Speech Independent Of The NSBA Did Not Exempt The NSBA From Constitutional Requirements.

The NSBA alleges that "[a]ny position by the NSBA on legislation did not prevent an individual member from taking and expressing a contrary position." Defs.' Mem. at CM/ECF p. 14. This fact is irrelevant to the question of which NSBA positions on legislation were non-chargeable. *Kingstad v. State Bar of Wis.*, 622 F.3d 708, 714 (7th Cir. 2010) ("Although the

dissenting group members were not restricted from communicating their own messages, were not compelled to participate in any actual or symbolic speech, and were not compelled to support any political or ideological viewpoint, the Court still held the program unconstitutional.") (citing *United States v. United Foods, Inc.*, 533 U.S. 405 (2001)); *see generally*, *Wooley v. Maynard*, 430 U.S. 705, 717 n.15 (1977) (legislation requiring license plate display of state motto unconstitutionally compelled speech because display affirms view expressed in motto, notwithstanding opportunity to disavow state's message through bumper stickers); *Planned Parenthood v. Rounds*, 530 F.3d 724, 746 (8th Cir. 2008) ("Even if the [individual] were able to disclaim sponsorship of the state's message, the constitutional defects inherent in compelled ideological speech would not be cured.").

Whatever freedom an individual NSBA member had to express his or her own views in 2013, he or she was still obligated to fund the NSBA's speech to the contrary. It is that compelled speech that Mr. Lautenbaugh challenges here. Because the NSBA's practices and procedures resulted in dissenting members' dues being expended on non-chargeable activities in 2013, Mr. Lautenbaugh is entitled to summary judgment that he is not required to remit any portion of his 2013 member dues to the NSBA.

## V. THE *KELLER* GERMANENESS ANALYSIS IS THE APPROPRIATE STANDARD OF REVIEW FOR MANDATORY BAR ASSOCIATION ACTIVITIES.

*Keller* held that a bar association could fund only those activities germane to its compelling purposes of "regulating the legal profession and improving the quality of legal services." 496 U.S. at 13. To counteract its fast and loose treatment of the *Keller* standard, the NSBA asserts that the guiding standard for chargeability determinations is a "balancing test." Defs.' Mem. at CM/ECF p. 27. Simply put, the cases the NSBA cites for this proposition do not

set forth a balancing test. The cited portions of *Keller* merely stand for the unremarkable statement that it is sometimes difficult to determine "[p]recisely where the line falls" when determining whether an activity is chargeable or not. 496 U.S. at 14. However, *Keller* does not advocate a balancing of bar association interests versus dues-payers' interests in determining where the line falls—it sets out a clear standard that activities germane to a bar association's purposes are those that regulate the legal profession and improve the quality of legal services. 496 U.S. at 13. Subsequent cases have further clarified that "in close situations, the accounting should favor the dissenter's right *not* to fund programs they find offensive." *Schneider v. Colegio de Abogados de Puerto Rico*, 917 F.2d 620, 637 (1st Cir. 1990) (emphasis in original); *Davenport*, 551 U.S. at 185 (explaining that *Hudson*, *Keller*, and *Abood* "were not balancing constitutional rights in the manner [the union] suggests, for the simple reason that unions have no constitutional entitlement to the fees of nonmember employees"). The NSBA's advancement of a balancing test is merely another attempt to avoid its burden to prove chargeability before it may utilize dissenting members' dues on the activity it claims is chargeable. *Lehnert*, 500 U.S. at 524.

Similarly, the cited portion of *Kingstad* does not advance a balancing test. Defs.' Mem. at CM/ECF p. 28. Instead, it stands for the self-evident truth that a bar association still violates its members' First Amendment rights when it uses their mandatory dues for non-chargeable activities, even if those activities are not political or ideological in nature. *Kingstad*, 622 F.3d at 716. The Supreme Court iterated in *Davenport*, and reaffirmed in *Knox*, that "[f]ar from calling for a balancing of rights or interests, *Hudson* made it clear that any procedure for exacting fees from unwilling contributors must be 'carefully tailored to minimize the infringement' of free speech rights." *Knox*, 132 S. Ct. at 2291 (quoting *Hudson*, 475 U.S. at 303).

As with other First Amendment challenges, the careful tailoring advocated by *Knox* is the controlling test here. *Id.* at 2289–91. All First Amendment challenges are analyzed under a two-part test that requires a 'compelling interest' and the 'least restrictive means' of achieving that interest. *Gibson*, 798 F.2d at 1569 (quoting *Hudson*, 475 U.S. at 2296 n.9); *Seidemann v. Bowen*, 499 F.3d 119, 124 (2d Cir. 2007) ("*Seidemann I*") ("[T]hat constitutional rights are protected by the First Amendment requires the union procedures be carefully tailored to minimize the risk of burdening employees' First Amendment rights."). When *Abood* first allowed compelled dues to be exacted from union members, it "did nothing more than identify a proper 'compelling interest' for the first step of this analysis." *Gibson*, 798 F.2d at 1569 (explaining that "*Abood* did not vitiate the 'least restrictive means' criterion; the Court merely defined one exceptional circumstance when compelled fees may be used to advocate views inimical to the beliefs of some union members. Wooden application of the *Abood* rule could arguably extend unlimited discretion to the Bar under its administration-of-justice function."). The Supreme Court's First Amendment jurisprudence simply does not allow for the NSBA's self-serving interpretation of the activities it may conduct with its members' compelled dues. Thus, Mr. Lautenbaugh is entitled to summary judgment that, in 2013, the NSBA conducted activities that were not chargeable to NSBA members under the *Keller* standard.

## VI. THE NSBA'S OPT-OUT PROCEDURE DID NOT SATISFY THE NARROW TAILORING REQUIRED BY THE SUPREME COURT'S FIRST AMENDMENT JURISPRUDENCE.

The NSBA attempts to distinguish *Knox* on the basis that the Legislative Check-Off on the 2013 member dues statement provided NSBA members with the opportunity to "'opt out' on an annual basis." Defs.' Mem. at CM/ECF p. 41. However, the NSBA assumes too much in limiting *Knox* to its specific facts. If the *Knox* ruling was limited to special assessments (as

opposed to annual assessments), then Justice Sotomayor would have joined the majority, rather than file a concurrence. *See Knox*, 132 S. Ct. at 2298–99 (agreeing with the result, but arguing that the majority erred in reaching the question of whether an opt-out procedure is ever constitutional) (Sotomayor, J., concurring).

However, it is the majority opinion that controls, and the majority clearly recognized the conflict between an opt-out procedure and *Hudson*'s mandate that "any procedure for exacting fees from unwilling contributors must be 'carefully tailored to minimize the infringement' of free speech rights." *Id.* at 2291 (quoting *Hudson*, 475 U.S. at 303). While *Knox* decided only the question presented, it provides significant authority[12] for the proposition that an opt-out procedure does not adequately protect dues-payers' constitutional rights, especially where, as here, the 2013 member dues notice provided no information as to the actual effect of selecting the Legislative Check-Off. *See* PSOF ¶¶ 43–44. Narrow tailoring requires the NSBA's procedures be no broader than necessary to satisfy the NSBA's compelling state interests. *Gibson*, 798 F.2d at 1569.

Additionally, an opt-in procedure properly places the burden on the NSBA and is consistent with *Knox*'s rejection of any "balancing of the 'right' of the union to collect an agency fee." 132 S. Ct. at 2291, 2295 ("[I]f unconsenting nonmembers pay too much, their First Amendment rights are infringed. On the other hand, if unconsenting nonmembers pay less than

---

[12] The Court reviewed the compelled speech precedents, beginning with *International Ass'n of Machinists v. Street*, 367 U.S. 740 (1961), and examined those cases' treatment of the opt-out requirement. *Knox*, 132 S. Ct. at 2290. The Court explained, "requiring objecting nonmembers to opt out of paying the nonchargeable portion of union dues—as opposed to exempting them from making such payments unless they opt in—represents a remarkable boon for unions. Courts 'do not presume acquiescence in the loss of fundamental rights.' Once it is recognized, as our cases have, that a nonmember cannot be forced to fund a union's political or ideological activities, what is the justification for putting the burden on the nonmember to opt out of making such a payment?" *Id.* (quoting *College Savings Bank v. Florida Prepaid Postsecondary Ed. Expense Bd.*, 527 U.S. 666, 682 (1999)) (internal citations omitted).

their proportionate share, no constitutional right of the union is violated because the union has no constitutional right to receive any payment from these employees.").  It is also consistent with the Supreme Court's recognition that a mandatory association has no right to "engage in its own protected speech activities," Defs.' Mem. at CM/ECF p. 27, with the compelled dues of its members.  *Davenport*, 551 U.S. at 186 (rejecting a union's claim that restrictions on the use of mandatory member dues violated the union's right to free speech because "[the restriction] is not fairly described as a restriction on how the union can spend 'its' money, it is a condition placed upon the union's extraordinary *state* entitlement to acquire and spend *other people's* money.") (emphasis in original).

As the foregoing demonstrates, the opt-out procedure used by the NSBA in 2013 does not survive strict scrutiny.  Therefore, the NSBA is not entitled to any portion of Mr. Lautenbaugh's 2013 member dues and Mr. Lautenbaugh is entitled to summary judgment.

## VII.  THE NSBA'S FAILURE TO PROVIDE CONSTITUTIONALLY ADEQUATE PROCEDURES WILL RESULT IN A DEPRIVATION OF PROCEDURAL DUE PROCESS IF MR. LAUTENBAUGH IS COMPELLED TO PAY THE FULL AMOUNT OF HIS 2013 DUES.

The NSBA argues that Mr. Lautenbaugh has not been denied any right to procedural process "as he has not been ordered to remit his 2013 fees to the NSBA."  Defs.' Mem. at CM/ECF p. 42.  Indeed, Mr. Lautenbaugh sought a preliminary injunction—and his 2013 dues were placed in his trust account in lieu of a preliminary injunction—precisely to avoid an infringement on his First and Fourteenth Amendment rights.  PSOF ¶ 6; Filing 8.  However, declaratory and injunctive relief is necessary to determine what portion, if any, of those dues must be remitted to the NSBA and what portion Mr. Lautenbaugh is permitted to transfer out of his trust account and utilize.  As previously demonstrated and demonstrated herein, prior to collecting 2013 dues, the NSBA failed to establish procedures that satisfied the constitutional

mandates of *Hudson* and *Keller*. Therefore, its deficient procedures will result in a deprivation of Mr. Lautenbaugh's 2013 dues without due process of law if he is ordered to remit them to the NSBA. *Hudson*, 743 F.2d at 1192–93. Mr. Lautenbaugh is entitled to judgment as a matter of law that those procedures violate his Fourteenth Amendment right to due process and Defendants are liable under 42 U.S.C. § 1983.

## CONCLUSION

For the foregoing reasons, summary judgment should be granted in favor of Mr. Lautenbaugh and against Defendants, declaring that (1) the NSBA's practices and procedures that were in full force and effect in 2013 violated the First and Fourteenth Amendments as a matter of law because they failed to provide proper notice, an impartial grievance procedure, and a refund or rebate; (2) the NSBA conducted non-chargeable activities using the mandatory member dues of dissenting members in 2013; (3) the NSBA's practices and procedures violated the U.S. Constitution as a matter of law because they failed to provide an opt-in procedure, rather than an opt-out procedure, for the use of Mr. Lautenbaugh's dues for non-chargeable activities; (4) the NSBA's failure to provide constitutionally adequate procedures violated Mr. Lautenbaugh's Fourteenth Amendment right to due process as a matter of law; and (5) Defendants are liable under 42 U.S.C. § 1983. This Court should further order that based upon these constitutional violations: (1) Defendants are permanently enjoined from collecting (or seeking to collect) the remainder of Mr. Lautenbaugh's 2013 dues; (2) Defendants are enjoined from reporting Mr. Lautenbaugh to the Nebraska Supreme Court for non-payment of those dues; and (3) Mr. Lautenbaugh is free to withdraw those funds from his trust account.

DATED this 31st day of March 2014.

Respectfully submitted,

/s/ Gina Cannan
Gina Cannan
Steven J. Lechner
Mountain States Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
gina@mountainstateslegal.com
lechner@mountainstateslegal.com

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

I certify that on the 31st day of March 2014, the foregoing document was filed with the Court and a notice of filing of same was provided to counsel of record via the CM/ECF electronic filing system.

/s/ Gina Cannan
Gina Cannan